592 F.2d 770
 Ella S. PORTER, Plaintiff-Appellant,
v.
Joseph A. CALIFANO, Jr., Individually and in his capacity as
Secretary of the U. S. Department of Health,
Education, and Welfare, et al.,
Defendants- Appellees.
 No. 76-3988.
 United States Court of Appeals,
Fifth Circuit.
 March 26, 1979.
 
 Carl E. Chamblee, Birmingham, Ala., Judson H. Miner, Chicago, Ill., for plaintiff-appellant.
 Wayman G. Sherrer, U. S. Atty., Henry I. Frohsin, Asst. U. S. Atty., Birmingham, Ala., Sandra H. Shapiro, Deputy Asst. Gen. Counsel, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before SKELTON*, Senior Judge, GOLDBERG and FAY, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 This case involves the constitutional and statutory rights of a federal employee punished for speaking. In recent years Congress and the courts have come a long way in expanding and fortifying those rights and in conferring on public employees citizenship of the first class. This decision is another episode in that journey.
 
 
 2
 Appellant Ella Porter was suspended without pay for thirty days from her clerk-typist job at the Southeastern Program Center of the Social Security Administration in Birmingham, Alabama. Porter was suspended primarily for writing and distributing a letter which, among other things, sharply criticized two of her superiors, appellees Listerman and Bruce. The suspension and appeal procedures in the Social Security Administration and the Civil Service Commission did not afford Porter an evidentiary hearing or discovery. After exhausting her administrative appeals, Porter sought review of the agency action in the federal district court by filing a complaint alleging the suspension violated her First and Fifth Amendment rights. 5 U.S.C. 706(2).[1] Porter requested and then moved to compel discovery. The district court neither ruled nor commented on Porter's discovery motion. Instead, the court granted defendants' motion for summary judgment. Porter appealed to this court the lower court's grant of summary judgment.
 
 
 3
 Porter claims that her Fifth Amendment right to due process was violated because she was suspended without being allowed a full evidentiary hearing and that her First Amendment right of free speech was violated because she was punished for making protected speech. The district court held that the Fifth Amendment did not require a full hearing when a public employee was suspended for thirty days. Relying mainly on the "rudimentary hearing" doctrine in Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974), and distinguishing Arnett v. Kennedy, 446 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) on the ground they involved more serious deprivations of property, the lower court found the more limited process specified in the controlling statute, 5 U.S.C. § 7501, and the administrative regulations, 5 C.F.R. § 752.301 et seq., and provided by the agency, to be constitutionally adequate for the more limited deprivation of property at stake. On the First Amendment claim, the lower court upheld the suspension in a single conclusory paragraph. At somewhat greater length the court reviewed the suspension on the merits under an extremely deferential standard of review gleaned from the Administrative Procedures Act. Specifically, the court found there was "substantial evidence to support the adverse action against" Porter and that the "action was not arbitrary, capricious, or an abuse of discretion." The court emphasized the limited nature of its review by adding: "This is the court's opinion, although if this court were considering the evidence de novo it quite possibly would make a different decision from that made by the agency."
 
 
 4
 We find that summary judgment on Porter's First Amendment claim was not proper in this case given the existence of several genuine issues of material fact. Fed.R.Civ.P. 56(c). Sartor v. Arkansas Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). Moreover, it is improper to rely heavily on the investigative findings and conclusions of an interested agency in a case such as this involving delicate and complex matters of an individual's constitutional right against the government,[2] especially where, as here, agency fact-finding procedures were inadequate. "The balancing here of First Amendment freedoms against an asserted governmental interest requires the judgment of the District Court. See A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 352, 460 F.2d 854, 860 (1971)." Ring v. Schlesinger, 164 U.S.App.D.C. 19, 30, 502 F.2d 479, 490 (1974).
 
 
 5
 In almost identical circumstances the D.C. Circuit Court in Ring v. Schlesinger, supra, held improper the district court's grant of the government's summary judgment motion.
 
 
 6
 In addition, we find that in this case Porter has a statutory right to a full evidentiary hearing in district court under 5 U.S.C. § 706(2)(F). Section 706(2)(F) authorizes the court to conduct a de novo review of agency findings and conclusions which are based on inadequate fact-finding by the agency.
 
 
 7
 For these reasons, we remand this case to the district court for a full hearing. The hearing which the district court will give Porter, however, clearly satisfies the requirements of the due process clause of the Fifth Amendment. Therefore we reject Porter's claim that the agency cannot suspend her unless it also gives her a full evidentiary hearing. We need not reach the constitutional question of whether a suspended government employee is entitled to a hearing under the 5th Amendment, as held in Keane v. Berry, 416 F.Supp. 858 (D.Ariz.1976) because we find that given the circumstances of this case Porter is entitled to a judicial hearing.
 
 
 8
 Finally, we also rule that the agency acted arbitrarily and capriciously in suspending Porter in part for her cautious behavior during interviews with the official she had accused of corruption.
 
 I.
 
 9
 A. Our first question is whether the lower court erred in granting the Government's motion for summary judgment.
 
 
 10
 Summary judgment is authorized only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Sartor v. Arkansas Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). The function of the court on a summary judgment motion "is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue." Nyhus v. Travel Management Corporation, 151 U.S.App.D.C. 269, 271, 466 F.2d 440, 442 (1972). On the appeal here from summary judgment for the Government, this court as the reviewing tribunal must give to appellant as the party against whom summary judgment was entered the most favorable view of the record. Libby v. L. J. Corporation, 101 U.S.App.D.C. 87, 247 F.2d 78 (1957).
 
 
 11
 We look to the Supreme Court case of Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny for the test in determining whether Porter was properly disciplined for her speech. In Pickering the Supreme Court said the First Amendment requires a balancing test between the interest of the employee in commenting on matters of public concern and the interest of the Government, as an employer, in promoting the efficiency of the public services it performs through its employees. Id. 88 S.Ct. at 1735. In applying this test, the Court articulated several of the factors which might be considered. Significantly, the Court noted it is relevant whether the employee's speech raised a "question of maintaining either discipline by immediate superiors or harmony among coworkers," Id., or interfered with the regular operation of the office generally. Id. at 1737. The Court also asked whether the employee who criticized his superiors had "the kind of close working relationships (with supervisors he criticized) for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." Id. at 1735.[3] And the Court asked whether the speech impeded the employee's proper performance of his daily duties. Id. at 1737. The Fifth Circuit clarified this question in Smith v. United States, 502 F.2d 512, 517 (5th Cir. 1974), holding that:
 
 
 12
 In order for the government to constitutionally remove an employee from government service for exercising the right of free speech, it is incumbent upon it to clearly demonstrate that the employee's conduct substantially and materially interferes with the discharge of duties and responsibilities inherent in such employment. Battle v. Mulholland, 439 F.2d 321 (5th Cir. 1971).
 
 
 13
 502 F.2d at 517.
 
 
 14
 On the other side of the balance a court must consider the values of First Amendment protection. Here the Court in Pickering emphasized "(t)he public interest in having free and unhindered debate on matters of public importance." Pickering, supra, 88 S.Ct. at 1737. More specifically the Court added "that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." Id. To these factors listed in Pickering, we would add one other. Since the First Amendment also concerns the right and need of the society's citizens to receive information helpful to their economic, social, and political activities, Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 1823, 1826-27, 48 L.Ed.2d 346 (1976), we note it is relevant whether citizens have access to the information contained in the employee's speech through avenues less disruptive of government purposes and efficiency.[4] Unless this balance favors the government, the government should not be permitted to punish an employee for truthful speech, or for false speech made without malice or reckless disregard of the truth. Pickering, supra, 88 S.Ct. at 1738.
 
 
 15
 Before concluding our general discussion of the First Amendment balancing test, one final word is in order. The First Amendment balancing test can hardly be Controlled by a finding that disruption did occur. An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office. Of course, as Pickering indicates, the chilling of even accurate speech may be justified in certain extreme situations, for example, in which the employee unduly breached confidentiality or disrupted intimate working relationships. The point is simply that the balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales.
 
 
 16
 We now consider the facts of the instant case, viewed most favorably for the appellant, in terms of this First Amendment balancing test. We note at the outset that the lower court based its decision on an administrative record we find inadequate[5] and on a few brief affidavits of the parties containing conflicting evidence and assertions. Two conflicts are critical. First, we find a genuine issue as to whether Porter's allegations of corruption are true or false. Second, we find a genuine issue as to whether, and to what extent, her speech "substantially and materially" interfered with the discharge of her duties, with the maintenance of discipline by superiors or harmony among coworkers, or with the operation of the office generally.
 
 
 17
 To elaborate on our ruling that these genuine issues exist, we must first provide additional factual background.
 
 
 18
 Appellant Porter was suspended on June 5, 1975 for 30 days on the following two charges:
 
 
 19
 "1. Writing letters to employees communicating false information which injured the reputation of management officials, lowered employee confidence in the integrity of the organization and adversely affected the efficiency of the office.
 
 
 20
 "2. Failure to cooperate with management."
 
 
 21
 Porter defended herself against these charges mainly by asserting her First Amendment right to speak and by denying certain factual assertions implicit in the charges.
 
 
 22
 The center of the case against Porter and of the first charge in particular is the material she distributed to her fellow employees in 1975. Porter distributed three things in the one mailing she made. First is a letter,[6] dated February 20, 1975, and signed by Porter appealing for "financial and moral support" for Don Jolly, a former President of the American Federation of Government Employees local in the Program Center and a former coworker of Porter's. Jolly had been fired a few months before Porter distributed her letter and, according to Porter, needed funds for the legal expenses in his appeal of his termination. Before being fired Jolly had made certain charges of conflict of interest against Listerman and Bruce, and in her letter Porter alleged appellees had had Jolly fired because of these criticisms. In addition, the letter again asserted that Listerman and Bruce were corrupt. The basis of this assertion is Listerman's and Bruce's role in AMWAY. AMWAY is a private corporation which apparently sells women's clothes and make-up and which Bruce, Listerman and other Southeastern Program Center employees work or worked for part-time. Porter accused Bruce and Listerman of using government time for AMWAY work and, more significantly, influencing their subordinates in the Program Center to join the AMWAY operation by favoring AMWAY members when making government promotion decisions.
 
 
 23
 Similar criticisms of the AMWAY connection with the office were made to Listerman by Don Jolly in 1971, when he was president of the local of the American Federation of Government Employees.[7] Jolly was fired in 1974, and was in the process of appealing his termination with the Civil Service Commission at the time of Porter's suspension.[8] In her letter Porter also alleged that Listerman had had Jolly fired because of his criticisms of AMWAY.
 
 
 24
 The second part of the three-part packet distributed by Porter is a copy of a confidential memo dated May 21, 1970 written by Bruce. The memo, entitled "Possible conflict of interest," refers to AMWAY discussions among Program Center employees. The memo, addressed to 13 Program Center employees, cautions against spending too much office time discussing AMWAY because it will invite criticism from "those who will be quick to look for any impropriety in your activities (all our activities)." However, the memo also encourages some discussion of AMWAY during the "brief conversations and discussions" that "each person spends . . . throughout each day" on "non-business matters in which they are interested, i. e., sports, weather, rumors, etc." "Since our interests lie in a much more intriguing and profitable area," the memo states, "it is to be expected that when we meet, the topic of our conversation will often be 'our favorite subject.' " The memo concludes by telling the addressees to treat the memo confidential "since persons who are not distributors would not understand" it.
 
 
 25
 The third part of Porter's distributed material is a chart showing various Program Center employees and their positions in relation to the "Listerman and Bruce AMWAY Organization, circa 1970-1972." The message implied in the chart is that government employees who joined AMWAY fared better in their Social Security careers under Listerman and Bruce than those who did not join AMWAY.
 
 
 26
 In determining whether Porter spoke falsely or with malice or recklessness, the lower court must consider all of the evidence, including the following. To begin with, we note that Porter, accused of recklessly disregarding the truth, in fact attached to her letter, and quoted in its entirety, a long memo written by her adversary. Second, the Record shows that Jolly, the former president of the union local, shared Porter's views and was, at the time of Porter's suspension, appealing his own termination apparently on the ground that he had been fired for making the same allegations as Porter. Moreover, several management officials indicated in the record that Porter and Jolly were not alone in their suspicions when Porter made her charges. Bruce spoke of employees "who were, or might be expected to be, sympathetic to Mr. Jolly's cause" even before Porter mailed her material. Another official, named Keller, referred to "persons in the 'Jolly group.' " And Cannon, the official who made the initial decision in the suspension procedure, said that the Porter material had been described to him initially by "some long-time employees" as " 'the same old slaps' at the Regional Representative." Thus, rather than the reckless lies of a single disruptive employee, Porter's charges might be an expression of the festering concerns of a considerable number of employees.
 
 
 27
 At several points in the administrative record[9] it is implied that since Porter read the file in the Jolly case before speaking about it, if she spoke about it inaccurately, then she spoke with malice or recklessness. However, the best evidence in the record presented by the government for this assertion could be read as supporting Porter, and even the truth of her statements, instead of the government.[10] Moreover, the record in the instant case does not contain the record in the Jolly case, or even an adequate description of it by someone other than Porter. Thus, it would be impossible for a court to decide from this record whether Porter's statements about the Jolly case were true or false. And of course Jolly was still appealing his case at the time Porter made her mailing, and our record does not report the final disposition of his appeal. Normally, one would not consider it malicious or in reckless disregard of the truth to assert simply that the claims of an appellant in ongoing litigation are meritorious.
 
 
 28
 Moreover, in an interview with Robert Flynn, a government official from the social security office in Baltimore who investigated Porter's suspension on her appeal to that office, Porter said she "could produce witnesses to testify that they had recently been solicited, on the premises, by persons on the 'chart', to join the AMWAY organization or buy its products, that notices were placed in the building giving the name and location of a person offering AMWAY products for sale, etc." Porter was not afforded a judicial or administrative hearing or subpoena powers, and these witnesses have not testified. Especially considering the fact that appellees did not produce specific evidence discrediting Porter's allegations, we feel it was improper for the district court to foreclose Porter's opportunity to present these witnesses and this evidence by granting summary judgment. In short, we find a genuine issue of fact as to the truthfulness of the statements Porter made in her letter concerning the operation of AMWAY in her office.
 
 
 29
 As for the truth of the memo attributed to Bruce, the government makes no claim that Bruce did not write and distribute it, or that Porter did not reproduce it accurately and in its entirety.
 
 
 30
 As for the accuracy of the "AMWAY Organization Chart," the record contains conflicting evidence. In his affidavit Jolly states that Bruce "identified the Listerman Bruce AMWAY Organization Chart as being a reasonable and accurate depiction of the AMWAY organization" at Jolly's arbitration hearing in July of 1974. However, Flynn disputed this version of Bruce's testimony when he interviewed Porter, commenting to her that "when testifying about the AMWAY organization, Mr. Bruce had specifically stated (the chart) was Not an accurate representation of the organization." (emphasis added) Unfortunately that testimony of Bruce's is not itself in the record, and Bruce is silent on this question in his affidavit and his interview with Flynn. Without further discussing this apparent conflict of evidence and incomplete record, we do note that most of the names listed by Porter on the AMWAY chart also had been listed by Bruce himself as addressees on his confidential AMWAY memo. In any case, the factual dispute is not properly settled at the summary judgment stage.
 
 
 31
 The second genuine dispute warranting a fuller hearing of the facts is the extent to which Porter's speech disrupted the office.[11] This record contains no evidence as to whether there was a measurable decline in the efficiency of Program Center operations and whether that injury was caused by Porter. In fact the main evidence placed by the government in the record even indirectly on this critical factual dispute is the selectively reported, largely anonymous and generally inconclusive third-hand hearsay contained in a memo written by Bruce, an obviously biased source.[12] Considering how may objective measures and more impartial witnesses were available, the Government's exclusive use of this kind of vague and biased evidence is especially suspect.
 
 
 32
 Moreover, Bruce's subjective characterization and selectively-reported third-hand hearsay account of anonymous employee reaction is equally compatible with mild and legitimate employee concern caused by the firing of a union leader who had accused management of abusing the promotion system. Furthermore, it is possible that the real source of the concern among employees was the secret AMWAY operation, and not Porter, merely the bearer of the bad news. Jolly asserts this in his affidavit. See note 7 Supra. Thus there is a clear conflict of evidence on this factual question, again making summary judgment improper.
 
 
 33
 As a general rule a court should use Rule 56 summary judgment most sparingly in a First Amendment case such as this involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities. This is especially true where the only affidavits supporting the motion for summary judgment come from officials who are attempting to silence a subordinate who has accused them of corruption, where those affidavits are vague and conclusory, and where the administrative record largely shaped by the officials themselves contains clearly conflicting evidence. Courts must not allow Rule 56 and the interests of judicial economy to become a rubber stamp obscuring rights indelibly printed in the constitution.
 
 
 34
 The district court on remand must determine, among other things,[13] to what extent Porter's allegations were false, to what extent they were malicious or reckless, and to what extent they "substantially and materially" adversely affected the government. See Ring v. Schlesinger, supra.
 
 
 35
 In addition, after determining the facts to its own satisfaction, the district court will have to conduct the balancing test prescribed in Pickering, supra. To guide it in this endeavor, we make the following comments. The First Amendment generally favors the marketplace testing of ideas and information rather than their arbitrary control by the government. As it is, the government itself, and especially its top officials, speak loudly in our society. Such volume is tolerable in part because the government does not speak in one voice. The First Amendment ensures that under most circumstances even the most junior government clerk typist can criticize the speech and acts of the top officials in her office as freely as any citizen can. Citing Pickering, the government in this case might reasonably respond that permitting and then refuting each and every charge its employees make will be inefficient and will drain agency resources. We have no doubt that the marketplace of ideas often entails such costs, but the Supreme Court has made clear that the First Amendment generally eschews this short-sighted view and is more concerned with the long-term gains of robust debate. To a point, and in certain circumstances, the First Amendment tolerates the chilling and punishing of employee speech. But it is not far beyond that point, and in only slightly varied circumstances, that we risk the strangulation of the free marketplace of ideas by the monopolism of official control. The First Amendment protects the ventilation of even the most noxious idea unless and until the government proves that the speech is so poisonous to government operations that, on balance, it is necessary to choke off the pungent exhalations of the sincere whistle-blower and suffer in the sadly thinner atmosphere that is left. Thus Pickering states that the First Amendment requires the government not just to show that certain employee speech injures the government, but to show that the benefits of preventing the injury actually outweigh the profound benefits of free speech in this society. In conducting the balancing test, and in considering the legitimacy of management's decision to punish and chill employee speech in this case as opposed to tolerating and rebutting it, the lower court will have to consider all relevant facts and arguments, including the following:
 
 
 36
 Porter's charges involved two ongoing matters the dispute over the termination of the top union leader of her office and the allegedly corrupt and continuing AMWAY operation. If true, her charges would be matters of current and legitimate employee and public concern, as well as matters in which management might be expected to have conflicting interests in regulating. Moreover, Porter's charges involved information which might not have been generally or otherwise available to many listeners.
 
 
 37
 Management itself said that Porter's charges were such that "employees who were familiar with the Jolly case . . . could make a judgment as to the accuracy of the material." In his interview with Flynn, the Social Security investigator from Baltimore, Appellee Bruce reportedly stated the following:
 
 
 38
 In February, Ms. Porter's letter and its attachment began being issued to program center employees. At first, distribution was apparently limited to those who were, or might be expected to be, sympathetic to Mr. Jolly's cause. Despite the misstatements of fact in the material, management felt no urgent need for action as long as distribution was limited to this group, or indeed, to program center employees who were familiar with the Jolly case and, consequently, could make a judgment as to the accuracy of the material. Subsequently, however, additional mailings were made, and the material began to reach new employees and members of the supervisory staff.
 
 
 39
 But of course one logical conclusion of this reasonable policy, and a conclusion more in keeping with the marketplace of ideas principle at the heart of the First Amendment, might be that management could have familiarized its employees, including new and supervisory, with the management's view of the facts of the controversy.
 
 
 40
 Since the agency decision to suspend and thus silence Porter was made after she had spoken fully, and since there was no claim that Porter intended a second mailing or further disclosures, the suspension did not meaningfully reduce Porter's allegedly "disruptive" influence in the Program Center. At best, it had a chilling effect on hypothetical speech in the future, presumably mainly disruptive speech by other employees on other matters.
 
 
 41
 Aside from the vague claim that Porter's speech hurt agency efficiency, appellees have made no claim that Porter was not performing her government job adequately.[14] Thus, by suspending Porter instead of neutralizing or balancing her speech with rebuttal management speech, management has deprived the government of 30 days work of one of its otherwise competent and productive employees.
 
 
 42
 Finally, we also note the connection between Porter's speech and Jolly's litigation of his own constitutional rights. With a few exceptions, the American legal system makes private parties pay their own legal fees. And yet meaningful access to our legal system is a fundamental right of citizenship in this country. Especially where the government is one of the parties in the related litigation, courts must most carefully scrutinize government action which attempts to chill private speech designed to raise funds for the legal fees of the private party litigating, and especially defending himself, against the government. See generally United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971), United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967), Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), and NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).
 
 
 43
 B. In setting aside the lower court's cursory rejection of Porter's constitutional claim, we note the possibility that the court may have relied on agency findings or deferred to agency rulings in making its decision. This too would be error. The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making. Whereas § 706(2) authorizes reviewing courts to overturn agency findings and actions involving Non-constitutional claims only when the agency has abused its discretion, § 706(2) (A), acted arbitrarily and capriciously, § 706(2)(A), or made findings unsupported by substantial evidence, § 706(2)(E), section 706(2)(B) explicitly authorizes the court to set aside any agency action "contrary to constitutional right . . . ."[15]
 
 
 44
 Thus, in A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 183, 421 F.2d 1111, 1118 (1969), the Court noted that even in an area as sensitive as the judgments of the Secret Service in protecting the President, a court must make an independent assessment of a First Amendment claim. The Court said:
 
 
 45
 The expertise of those entrusted with the protection of the President does not qualify them to resolve First Amendment issues, the traditional province of the judiciary. A balancing of First Amendment freedoms against the requirements of Presidential safety may be left to other agencies in the first instance. But absent a compelling showing which has not been begun here that courts cannot evaluate the questions of fact involved in estimating danger to the President, the final judgment must rest with the courts. To enable the court to reach a reasoned conclusion, it is incumbent upon any party who would invoke Presidential safety as a paramount consideration to provide the court with the information necessary to an even-handed decision.
 
 
 46
 Id. 137 U.S.App.D.C. at 183, 421 F.2d at 1118.[16]
 
 
 47
 Our literal reading of § 706(2)(B) is consistent with general principles of constitutional adjudication. As the Supreme Court noted in Pickering, supra 88 S.Ct. at 1740 n.2, "(t)his Court has regularly held that where constitutional rights are in issue an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case. E. g., Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, (79 L.Ed. 1074) (1935), Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946), and New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964)."[17]
 
 
 48
 Moreover, Porter would of course have a right to sue directly under the constitution to enjoin her supervisors and other federal officials from violating her constitutional rights. See, e. g., Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In that case there would be no statutory reason for the court to defer to agency findings or rulings. Whether Porter sues directly under the constitution to enjoin agency action, or instead asks a federal court to "set aside" the agency actions as "contrary to (her) constitutional right(s)" under § 706(2)(B), the role of the district court is the same.
 
 
 49
 To summarize, it is not clear from the lower court's opinion in the instant case whether the court wrongly deferred to the agency determination of Porter's constitutional rights, or simply ruled independently but wrongly against Porter by granting the government's summary judgment motion when genuine issues of fact remained. In either case, though, the court erred and we must remand the case to it for a full hearing and independent judgment on Porter's constitutional claim.
 
 II.
 
 50
 In addition, we find that Porter is entitled to a de novo review in the district court of all her claims against the agency under § 706(2)(F). Under § 706(2)(F) facts are "subject to trial de novo by the reviewing court" when "the (agency) action is adjudicatory in nature and the agency factfinding procedures are inadequate." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 51
 Obviously this case involves administrative action of an adjudicatory nature. We think it is equally clear that the agency's fact-finding procedures were inadequate in this particular case. The chief inadequacy in the agency fact-finding procedures used in this case was the pervasive role played by Listerman and Bruce, the officials Porter explicitly accused of corruption. Bruce conducted the initial fact-finding interviews with Porter about her accusations. After the meetings, Bruce initiated the disciplinary process by recommending to his superior that Porter be punished. That official relayed the recommendation to Listerman, who turned the matter over to his subordinates "for review and any action deemed appropriate."[18] The subordinate who conducted this investigation and review, James Cannon, conducted one interview he met with Bruce "to go over the background."[19] Bruce used the occasion to impress upon Cannon, who was inferior to Bruce in the bureaucracy, that the Porter matter was "a serious one, requiring serious consideration and a serious disciplinary action, if adverse action were to be taken." In assessing the impact of Porter's material on the efficiency of the office, Cannon apparently relied entirely on a one-page memo written by Bruce.[20] Cannon conducted no investigation of his own into this question or any other question in the controversy. He never interviewed Porter. For her position he relied entirely on her statements to Bruce in their two meetings, and on the material she distributed. Moreover it does not appear that Cannon ever asked a single question of anyone about the AMWAY operation.
 
 
 52
 Cannon recommended to his superior, Hunter Keller, that Porter should be suspended. Porter was then informed of this recommendation and the reasons for it and permitted to write a letter in response. Keller, after reading Porter's letter and the file collected by Cannon, decided to suspend Porter for 30 days.
 
 
 53
 Upon Porter's appeal of her suspension, the central headquarters of the agency in Baltimore dispatched an investigator named Robert Flynn to Birmingham to conduct interviews in the Program Center. Flynn interviewed seven persons in total over a three day period. Flynn interviewed Bruce and Listerman, but did not ask them about AMWAY. Flynn interviewed Porter only once, and only after he had completed all his other interviews. He did not reinterview the persons Porter felt she could impeach. Thus, Porter was denied an opportunity to confront her accusers even in the most rudimentary sense of having Flynn ask her questions for her. Flynn did not interview Jolly or anyone else sympathetic to Porter's position, in spite of the fact that Porter told him she knew of fellow employees who could corroborate parts of her story. The research conducted by the Baltimore office did not entail an adequate inquiry into the central issues in the case i. e. the truth of Porter's statements, the alleged disruptive impact of these statements on the Program Center, and the fairness of the prior investigation of Porter. In addition, to the extent questions about these matters were asked, they were asked, without benefit of cross-examination, only of persons accused of wrong-doing by Porter, and thus obviously biased, or of persons who conducted the initial investigation, which, as we noted, was heavily influenced by Bruce and Listerman.[21]
 
 
 54
 Either of these inadequacies by itself an initial investigation overly influenced by biased superiors and a superficial review investigation might not render agency fact-finding procedures inadequate under § 706(2)(F).[22] Rather, we find the process inadequate in the instant case because the biased or otherwise inadequate initial fact-finding process was not cured by a subsequent impartial and full review in the agency.
 
 
 55
 In similar circumstances, although not under the dictates of § 706(2)(F), the Supreme Court in Pickering, supra, 88 S.Ct. at 1740 n.2, noted the stricter standard of review generally applicable to the fact-findings and conclusions of a less than impartial tribunal.[23]
 
 
 56
 The Court stated,
 
 
 57
 we do not propose to blind ourselves to the obvious defects in the fact-finding process occasioned by the board's multiple functioning Vis-a-vis appellant. Compare Tumey v. State of Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Accordingly, since the state courts have at no time given De novo consideration to the statements in the letter, we feel free to examine the evidence in this case completely independently and to afford little weight to the factual determinations made by the Board.
 
 
 58
 But a more fundamental inadequacy lies at the heart of the agency procedures used in this case. Given the circumstances of this case, we would be hard-pressed to imagine adequate fact-finding procedures which did not include an opportunity for Porter to discover evidence, and to subpoena and to cross-examine witnesses in short, a full evidentiary hearing. Porter claimed that leading officials in her office were corrupt and had punished employees who opposed them. Without subpoena power, Porter's only hope is that a few of her fellow employees, knowing of Porter's own suspension and Jolly's recent termination, will courageously come forward and support her story by speaking either with the management accused of corruption and vindictiveness or with a single, anonymous official who passes through the office unannounced on a brief visit. Such risk-taking is courageous, but not an especially reliable fact-finding procedure in heated constitutional controversies. Moreover, since matters of good faith and credibility are at the center of this case, the lack of opportunity for discovery and cross-examination are especially damaging to the pursuit of truth.[24]
 
 
 59
 The government's interest in not providing a hearing in this case is minimal. Since a hearing could be held during or after the suspension, and since the government is allowing the eventual return of the employee in any case, the holding of a hearing does not force the government to tolerate the presence of the employee and her alleged disruptive influence any more than if no hearing were held. Moreover, a hearing would not likely be more fiscally or administratively burdensome than the existing procedure. The reviewing investigator in this case traveled from Baltimore to Birmingham at considerable expense to the government and conducted three days of interviews. We doubt that even a full evidentiary hearing in this case would last more than three days or cost the government much more than this visit. See Keane v. Berry, 416 F.Supp. 858, 860-61 (D.Ariz.1976).
 
 
 60
 In conclusion, considering the shortcomings of the agency fact-finding procedures used in this case, we find that, under 5 U.S.C. § 706(2)(F), as interpreted by the Supreme Court in Overton Park, the agency fact-finding procedures used in this case were inadequate. Therefore, under § 706(2)(F), the district court should hold a de novo hearing in reviewing Porter's 30-day suspension.
 
 III.
 
 61
 One final matter must be resolved. There is no need to remand for further litigation the government's claim that Porter can be suspended for " failure to cooperate with management." This charge is groundless. To the extent Porter's suspension was based on this charge, the suspension was arbitrary and capricious and is hereby set-aside. 5 U.S.C. § 706(2)(A).[25]
 
 
 62
 This charge against Porter was based solely on the behavior of Porter, her lawyer, and her "personal representative" in two meetings with Bruce.[26] As we noted earlier, these meetings were presumptively improper because they permitted the man accused of corruption by Porter to be the initial and chief investigator of her charges. But once she was forced to participate in the meetings upon being threatened with an insubordination charge by Bruce she had a right to protect her own interests in a reasonable way in what was obviously an adversary context. Certainly her caution, her reluctance to retract her prior statements or to make additional self-incriminating statements to her chief adversary, can hardly by itself justify a "non-cooperation" charge and punishment. Such use of this charge could lead to obvious abuses and intimidations of dissenters, whistle-blowers, or just independent thinkers. Such a charge might also be abused by managers who suspect certain substantive offenses but are not able to prove them. Though Bruce represented the two meetings as simple "information seeking" sessions, they seemed more like preliminary stages in Bruce's campaign either to intimidate Porter into retracting her statements about him or to begin collecting self-incriminating statements for later use in an impending adverse action against Porter.[27]
 
 
 63
 Immediately after the second meeting Bruce proposed that Porter be suspended, and she was soon after. The accounts of the two meetings, and a memo written by Bruce, comprised the bulk of the investigatory file used against her.
 
 
 64
 Moreover, it is not even clear what additional cooperation or information management expected from Porter. During the meeting she frankly confirmed she wrote the letter (after all, she had signed it and had never denied writing it) and repeated that she believed her statements were true. As is obvious from the circumstances, certainly Bruce knew as much or more than Porter about the AMWAY operation, about his own secret memo, and even about Jolly's dismissal (e. g., during the meeting Bruce said, "(W)e know precisely why (Jolly) was terminated.").
 
 
 65
 Also, it is hardly the case that Porter was the prime or sole source of "evasion" during the meeting. When Bruce asked Porter if she was the author of the letter, signed by her, she said yes. When Porter asked Bruce if he was the author of the memo signed by him, he answered:
 
 
 66
 I don't intend to let this interview be turned around to be an interview of management in this respect. We are here to find out what the basis of this letter from Mrs. Porter's knowledge. (sic)
 
 
 67
 Bruce made this statement in spite of the fact that he began the meeting by saying:
 
 
 68
 Furthermore, during the course of the interview, we may find it necessary to provide Mrs. Porter and her representatives with information we might have that you might not have available to you.
 
 
 69
 But when Porter's lawyer asked for this information, Bruce replied: "We have no reason to believe that she does not have all the information that we intend to present to her."
 
 
 70
 We conclude that it is unthinkable that a public employee who attempts to expose corruption in her office should be punished for not "cooperating fully" in an interview with the officials she has accused. In her February letter Porter accused Bruce of corrupt practices and of "covering his tracks." Bruce then uses his government authority to order Porter, with one day's notice, to come in and reveal the evidence she has for her allegations against him. We can hardly imagine convicting a man of obstructing justice if, when he complains of police brutality, the department sends the policeman accused of the brutality to investigate and the victim insists on speaking through the key hole.
 
 
 71
 Such a flagrant conflict of interest in an investigator may or may not by itself constitute a violation of due process,[28] but it clearly can not fairly form the basis of a charge that the employee is improperly and actionably not cooperating with management.
 
 IV.
 
 72
 Suspension of Porter from her job, and other penalties and privations resulting therefrom,[29] may be the only material issue before the Court, but what we hold here may and should impart an important dignity to the First Amendment expressions of those who are federal employees, which employees, if not exactly equal, at least approach parity with the freedom from government regulation of those who work and speak elsewhere.
 
 
 73
 In summary, we affirm the lower court's denial of Porter's due process claim, but only on the ground that the provision of a full de novo judicial review hearing in federal court satisfies Porter's 5th Amendment right to due process in this case.
 
 
 74
 We remand to the district court, for discovery[30] and a full evidentiary trial on Porter's First Amendment claim and the agency's decision to suspend Porter for
 
 
 75
 "Writing letters to employees communicating false information which injured the reputation of management officials, lowered employee confidence in the integrity of the organization and adversely affected the efficiency of the office."
 
 
 76
 And we hold that Porter's suspension was arbitrary and capricious to the extent it was based on the charge concerning Porter's alleged "failure to cooperate with management."
 
 
 77
 Affirmed in part, reversed in part, and remanded in part.
 
 SKELTON, Senior Judge, specially concurring:
 
 78
 I concur with the result reached in the opinion in this case because, among other reasons, I basically disapprove of the discharge or suspension of a Government employee where the employee has not been granted an evidentiary hearing with the rights of confrontation and cross-examination of witnesses. See my dissenting opinion in McGlasson v. United States, 184 Ct.Cl. 542, 397 F.2d 303 (1968), in which Judge Durfee joined, and my concurring opinion in Scroggins v. United States, 184 Ct.Cl. 530, 397 F.2d 295 (1968), in which Judges Durfee and Collins joined.[1]
 
 
 79
 I agree with the Supreme Court decision in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that a meaningful hearing must be granted, at some stage of the proceedings, to a plaintiff whose property rights are involved. That was not done in this case.
 
 
 80
 It may be that the agency was justified in suspending the appellant for 30 days. Whether or not this is so will now be determined in a meaningful hearing held in the district court. Consequently, it would be inappropriate for us to express an opinion on the merits of the case.
 
 
 
 *
 Senior Judge of the United States Court of Claims, sitting by designation
 
 
 [1]
 The trial court found federal jurisdiction under the Administrative Procedures Act, 5 U.S.C. §§ 702, 704 and 706. However the Supreme Court subsequently precluded finding subject matter jurisdiction under the APA. Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Instead, as Sanders also notes, the district court's jurisdiction lies under 28 U.S.C. § 1331
 
 
 [2]
 See 5 U.S.C. § 706(2)(B) and discussion at pp. 780-782 Infra
 
 
 [3]
 In a footnote the Court elaborated by saying that "significantly different considerations would be involved in" cases involving government jobs "in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal," or "in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." Id. at 1735, n.3
 
 
 [4]
 Related to this is the question of whether the employee can achieve his purposes by speaking in less disruptive ways. See e. g., Pickering, supra, 88 S.Ct. at 1737, n.4
 
 
 [5]
 See pp. 782-784 Infra
 
 
 [6]
 In its entirety, the letter reads:
 1616 30th Street West
 Birmingham, Ala. 35208
 February 20, 1975
 Dear
 Our former AFGE Union President and Co-worker Don Jolly was terminated from his GS-11 job with the Southeastern Program Center after 14-years of outstanding service to the Social Security Program and to his fellow employees. Don also had over 7 years in the military service of his country with three honorable discharges to his credit.
 On December 27, 1974, E. J. Listerman, Regional Representative of the Southeastern Program Center Social Security Administration, culminated a two year effort to remove Don from his job, because it was Don Jolly who uncovered the despicable AMWAY operation in the Southeastern Program Center in 1971 when he was serving as our AFGE Union President. E. J. Listerman never forgot this expose because of his own tremendous involvement in the pyramid sales scheme in the Program Center in concert with Thomas Bruce who was then serving as an Alabama District Director for the AMWAY Pyramid Organization.
 Don Jolly is truly a great fighter for human rights having represented over 1200 Program Center employees during his years as AFGE Union Executive Vice-President and President. Don has not stopped fighting now to correct the terrible vindictiveness displayed by E. J. Listerman in the termination action. However, Don is only mortal and as such needs your help to right this terrible wrong committed against him.
 I am making an appeal to you for Don Jolly and his family of four children. Don is presently unemployed and on the verge of bankruptcy due to the tremendous personal expense he has suffered trying to hold out against E. J. Listerman with his unlimited supply of taxpayer dollars. Don presently has his termination pending before the United States Civil Service Commission and has engaged legal counsel to help him present his case before the commission. This action of itself entails further huge outlays of money for competent legal representation. E. J. Listerman on the other hand does not have to expend one penny of his own money in his efforts to cover his tracks in the deceitful mission he set about to carry out against Don Jolly.
 When Don Jolly wins his case for human rights, all employees in the federal service will benefit and an end will be accomplished in stopping the tyranny of certain bureaucratic "Heads" who abuse the power of their positions.
 Don needs your financial and moral support more than ever at this time, and I am requesting that you open your heart and your spirit of friendship to this man in his hour of gravest need. Please send any financial support that your conscious (sic) directs, large or small, to: Don Jolly Post Office Box 5816 Birmingham, Alabama 35209. I have enclosed a stamped addressed envelope for your convenience, and I pray that you and all of us will never again be dehumanized as E. J. Listerman is attempting to do to Don Jolly. Thank you.
 Sincerely,
 (s) Ella S. Porter
 Ella S. Porter (Mrs.)
 
 
 [7]
 In his affidavit Jolly states:
 As President of American Federation of Government Employee's Local 2206 in the Southeastern Program Center in Birmingham, Alabama, I met with Mr. E. J. Listerman, the Regional Representative of the Southeastern Program Center in 1971 to advise Mr. Listerman about the low employee morale being created by the AMWAY pyramid sales organization in the Program Center, especially his own involvement in this operation along with that of Mr. Thomas Bruce and Mr. James Grant, Staff Assistant to Mr. Listerman. I further advised Mr. Listerman that this conflict of interest operation should cease immediately. Also, I further advised Mr. Listerman that the expression "AMWAY Promotions" was becoming commonplace among the employees who were not selling AMWAY products for the Bruce-Listerman AMWAY sales organization.
 Mr. Listerman gave me no assurances that he would put a stop to this conflict of interest in the Southeastern Program Center, and I in turn instructed all officers and Stewards who might be selling AMWAY for the Bruce-Listerman team to either give up their AMWAY involvement or to resign as officers and/or Stewards of AFGE Local 2206. Only two Stewards refused to stop selling for the Bruce-Listerman team Mrs. Florence Brown and Mr. Carl Stoudermire.
 
 
 [8]
 The record does not report any resolution of this appeal
 
 
 [9]
 Most significantly this was stressed in the Forbus letter, record, tab 20, which informed Porter that she had lost the final administrative appeal of the substantive propriety of the suspension
 
 
 [10]
 In its second interview with Porter, the government, reading from the proposal to fire Jolly, quoted the three official reasons for Jolly's termination as:
 "Number one: poor quality of work. Number two: failure to cooperate with your superiors. Item three: creating an atmosphere adversely affecting employer relationships."
 Bruce then said, "Mrs. Porter, in view of the three specific charges which were the basis for Mr. Jolly's termination, do you still hold the same opinion as reflected in your letter that Mr. Listerman terminated Mr. Jolly because it was Mr. Jolly who uncovered the despicable Amway operation in the Southwestern (sic) Program Center?"
 Porter's lawyer responded: "There is a great deal in this third thing about creating atmosphere adversely affecting employer relationships. There is a great deal in here about criticism of one's supervisors, writing a newsletter, these sorts of things. I think that based on that, it is a reasonable inference that that had some hand in this."
 Again, we are strictly limited by the paucity of information in this record about the particulars of Jolly's case. Nevertheless, we note that charges two and three against Jolly are almost identical to the two charges against Porter. And we note that the two charges against Porter were initiated largely by Bruce and Listerman and were based on Porter's allegations about their role in AMWAY. Contrary to the thrust of Bruce's challenge to Porter, quoted above, it might seem that a careful reading of the official charges against Jolly, in light of the subsequent charges against Porter, would tend to confirm rather than discredit Porter's earlier suspicions about the reasons for Jolly's termination. And yet we note that this short exchange between Bruce and Porter's lawyer was one of the only references in the record on which the lower court might have based a finding that Porter spoke falsely, recklessly, or with malice.
 
 
 [11]
 At the outset we note that the government does not allege, and it does not appear, that this case involves a special need for employee confidentiality as mentioned in Pickering, supra, or that Porter, a clerk typist, occupied a position of intimacy with those supervisors she criticized
 Moreover, even if she were in such a position of intimacy, it is not clear exactly how the Pickering intimacy exception would be extended to the Suspension of an employee. Pickering speaks of firing an employee for criticism which would "seriously undermine the effectiveness of the working relationship" of a "personal and intimate nature." This seems analogous to the general rule of contract law that a court will not order specific performance of an intimate employer-employee contract even if the contract has been illegally breached by one of the parties. But an employee who is suspended for 30 days will eventually return to his job of intimate contact with his employer. Conceivably he will return with the same alienation which caused him to speak originally unless agency fact-finding has settled his concerns and perhaps with additional resentment caused by his punishment. The employer may also still be uncomfortable with the relationship. Thus, the policies which supported the "intimacy" termination in the Pickering hypothetical do not apply as directly to a suspension case.
 
 
 [12]
 The Bruce memo cites only two specific examples of "employee concern." First, the memo says that an anonymous clerical employee asked Heflin, a union official, about the truth of the Porter allegations, because, the clerk added, if they were true she "could have no assurance that EEO (Equal Employment Opportunity) concerns and issues would be handled with integrity." Needless to say, this sort of expression of interest in Porter's allegations hardly evidences an employee morale crisis or demonstrates that office efficiency has been "adversely affected," as management contended. Second, it is exactly the kind of discussion one would expect and indeed might want in a government office after the firing of a union leader who had accused management of corrupting the merit promotion system. Third, we note that Heflin, who reported this anonymous question to Bruce, had also been accused by Porter of misconduct. The Bruce memo also cites as evidence of Porter's disruptive influence the worries of one official Porter had implicated, apparently accurately, in the AMWAY operation. The memo says that Carl Stoudemire, an EEO counselor, whose "name was also mentioned in the letter or its attachment," complained that Porter had "undermine(d) his effectiveness as a counselor." The memo continued: "If he is viewed as being involved in some improper activity, he feels that employees will not come to him for counseling on their problems in the EEO field."
 There is real irony in Bruce's citing this as evidence of Porter's bad faith disruption of the Program Center. In fact Porter did not mention Stoudemire in her letter Bruce did, in his "confidential" memo, which Porter merely distributed. Bruce named Stoudemire in the list of Program Center/AMWAY workers to whom Bruce distributed the memo originally and Porter merely repeated the name in her chart of AMWAY workers. Also, it seems rather disingenuous to accuse a whistle-blower of injuring employee morale by showing no more than that an accurately exposed fellow employee is unhappy about being exposed. This is truly an interesting new version of the heckler's veto.
 
 
 [13]
 E. g., the lower court, in making the Pickering balance, should also determine and consider the extent to which the information Porter distributed was available, or could have been distributed, in less disruptive ways
 
 
 [14]
 Indeed, appellees do not even dispute Porter's claim that she used absolutely no office time or resources to promote her position, a conscientiousness and single mindedness of purpose in her government job apparently not entirely shared by appellees Bruce and Listerman, judging from Bruce's "confidential" memo on AMWAY discussions in the office
 
 
 [15]
 Independent judicial judgment is especially appropriate in the First Amendment area. Judicial deference to agency fact-finding and decision-making is generally premised on the existence of agency expertise in a particular specialized or technical area. But in general, courts, not agencies, are expert on the First Amendment
 
 
 [16]
 In a later stage of the same litigation, A Quaker Action Group v. Morton, 148 U.S.App.D.C. 346, 353, 460 F.2d 854, 861 (1971), the Court held that while it was not suggesting that "there is always a right to de novo record on constitutional issues," "we think a party seeking in court an oral examination of officials needed in connection with a substantial First Amendment claim cannot be disabled for failure to exhaust administrative remedies unless there was a clear indication of the availability of such an administrative procedure (i. e., oral examination)." Similarly in the instant case, agency procedures did not afford Porter an evidentiary hearing. As in the instant case, the Court in Quaker said:
 (W)e need not consider the further issue whether, or under what circumstances, even in a case where such an administrative procedure has been provided the District Court hearing the request for injunction on First Amendment grounds should predicate its crucial First Amendment judgment on its own assessment of the demeanor and testimony of key witnesses, with opportunity in the court to ask clarifying and probing questions (and even to call its own witnesses), rather than taking the case solely on a closed record made out of court.
 Id. 148 U.S.App.D.C. at 353, 460 F.2d at 861.
 
 
 [17]
 Pickering and the cases it cited are distinguishable from the instant case because they involved Supreme Court review of State administrative and State court findings, as opposed to the federal court review of Federal administrative findings in this case. Also, the instant case concerns interpretation of a Congressional statute. Thus, one might argue that it would not be especially inconsistent for Congress to require federal courts to defer to federal agencies on questions of federal constitutional law to a greater extent than the Supreme Court defers to state administrative boards and state courts on the same federal constitutional questions. Indeed, one might even say that the Pickering cases are more analogous to 42 U.S.C. § 1983, which establishes that federal courts not defer to state administrative actions which allegedly violate federal constitutional or statutory rights. Nevertheless, the Supreme Court notes that to reach this independent scope of review in Pickering, it had to overcome its strong policy of giving "great, if not controlling, weight to the findings of the state courts." In deciding to overcome this strong policy, the Court emphasized the requirements of federal constitutional review generally, rather than the unreliability or bias of state adjudication in particular in matters of federal law. We will not build inference on inference to find that Congress intended to require the federal courts to abandon their independent vigilance on these same constitutional matters simply because a federal agency is involved, especially when the clear words of § 706(2)(B) are to the contrary
 
 
 [18]
 Bruce affidavit, record p. 26, confirmed by Listerman in his affidavit, p. 22
 
 
 [19]
 Flynn interview with Cannon, record, tab 20
 
 
 [20]
 The Bruce memo is discussed at greater length in note 12, Supra, and accompanying text
 
 
 [21]
 See Bray v. United States, 515 F.2d 1383, 1385, 207 Ct.Cl. 60 (1975) ("inclusion of materials in the summaries prepared for the use of the (reviewing boards) that had been discredited and excluded in the proceedings of the board of officers tainted each of the subsequent reviews and prejudiced plaintiff's right to fair and objective review proceedings")
 
 
 [22]
 Cf. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 1652, 40 L.Ed.2d 215 (1974), where the majority of Justices did not concur in Justice White's view that § 7501 required there be an "impartial decision-maker" to conduct the preremoval hearing. Justices Powell and Blackmun rejected Justice White's position because "an impartial decisionmaker is provided at the post-removal hearing where the employee's claims are finally resolved." 94 S.Ct. at 1652 n.5. But see Ward v. Village of Monroeville, Ohio, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), (violation of due process to have hearing before judge with financial interest in outcome of case, even though appeal to impartial decision-maker was available.). See also Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973)
 
 
 [23]
 Similar to the instant case, in Pickering the initial fact-finder had been "the same body that was also both the victim of appellant's statements and the prosecutor that brought the charges . . . ."
 
 
 [24]
 See Keane v. Berry, 416 F.Supp. 858, 860 (D.Ariz.1976)
 
 
 [25]
 We leave to the district court to determine on remand whether, and to what extent, Porter's suspension can be justified on the sole basis of the first charge against her
 
 
 [26]
 The first meeting broke down when Bruce refused to allow Porter to tape record the meeting. Instead Bruce insisted it was sufficient that his secretary was present to "take minutes of the meeting." He also supported his opposition to the tape recorder in part by representing that the meeting was not related to the possibility of charges against Porter for her speech. A second meeting was held two days later in the presence of a court reporter paid for entirely by Porter. The meeting mostly involved factual and legal debates between management and Porter's ACLU lawyer, although Porter did use the opportunity to indicate that she did sign the letter and still thought it was true and accurate
 
 
 [27]
 According to Bruce, long before his meetings with Porter it was "the opinion of the agency (that) these letters were undermining employee confidence in management, disrupting employee-employer relationships, and otherwise impairing the efficiency of the office." (Bruce affidavit.)
 
 
 [28]
 But See Ward and Gibson, p. 783 Supra (violation of due process to have initial hearing before biased decision-maker even though appeal to impartial decision-maker is available.)
 
 
 [29]
 These could be considerable. In addition to an immediate loss of one twelfth of her yearly salary, Porter will likely suffer continuing harms, such as an inability to gain promotions as easily as she might, as well as the general stigma that attaches to a disciplined employee
 
 
 [30]
 We note Porter filed a motion for discovery which was preempted by the court's grant of the appellee's motion for summary judgment
 
 
 [1]
 Immediately after the issuance of these opinions, the Civil Service Commission promulgated new disability retirement regulations, effective July 1, 1968, which provided for hearings in disability retirement cases. See: 33 F.Reg. 7715-17 (May 25, 1968). Hearings were not granted in such cases prior to the issuance of these new regulations