Donald G. JOLLY, Appellant,

v.

E. J. LISTERMAN, Regional Representative, Bureau of Retirement and Survivors, et al.

No. 80–2265.

United States Court of Appeals, District of Columbia Circuit.

Argued 11 Sept. 1981.

Decided 15 Jan. 1982.

As Amended March 18, 1982.

Judson H. Miner, Chicago, Ill., with whom Timothy J. Bloomfield, Washington, D. C., was on the brief for appellant.

A. Patricia Frohman, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Atty., Washington, D. C., were on the brief for appellees.

Before TAMM, WILKEY and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

WILKEY, Circuit Judge:

We are called upon in this case to decide whether the Social Security Administration (SSA) exceeded its statutory authority by dismissing one of its employees. Two issues are raised for our consideration: (1) whether, following an earlier remand from this court for reconsideration of its dismissal in light of reduced charges, the SSA denied appellant due process by reaffirming its decision; and (2) whether the SSA's adherence to its prior decision to discharge appellant, notwithstanding the reduced charges, was arbitrary and capricious. We resolve these issues in favor of the SSA's action; we therefore affirm the district court's order reinstating summary judgment for defendants-appellees.

## I. BACKGROUND

We shall provide some context to this matter at the outset by capsulizing the events leading to appellant's discharge from the Social Security Administration (over seven years ago) and the steps leading to his appearance (once again) before this court.

Donald Jolly started with the Bureau of Retirement and Survivors Insurance of the Social Security Administration at its Southeastern Program Center in Birmingham, Alabama, in 1960. By December 1969 he had progressed from a GS–5 position to a GS–11 assignment as a quality reviewer in the Quality Appraisal Department, where he performed "end of line" review on samplings of claim files, searching for various processing errors. He remained in this position until early 1971, when he was assigned to a district office visitation program. He was involved exclusively in this program until January 1972.

During these years with the SSA Jolly was active in union work, and was elected president of Local 2206 of the American Federation of Government Employees (AFGE) for three consecutive terms, extending from 1969 to 1972. With union concerns dominating more and more of his time, Jolly took an approved leave of absence from the SSA from January to August of 1972 to devote all his energies to union activities. In August of that year, however, apparently as a result of intra-union friction and controversy, the national union headquarters imposed a trusteeship upon Local 2206 and removed Jolly as president. New local officers were appointed by AFGE leadership in October 1972, which thereby divested appellant of any official union responsibilities.

By this time Jolly had entered into the SSA's Staff Development Program, a program designed to train promising employees for supervisory positions and for which he had been selected in July 1972. Appellant completed the first phase of his training but resigned from the program on 5 January 1973 when he was unable to obtain a six-month extension before being transferred to Atlanta, Georgia, for the second phase.[1] He was thereafter reassigned to the Quality Appraisal Branch as a quality reviewer. Because his experience in that position had been limited by his involvement in other programs and activities over the previous two years, he was required to retrain for the job.

It was anticipated that it would take Jolly about two months of retraining to obtain a level of accuracy that would permit "graduation" from trainee status to that of a final reviewer. In fact, however, he remained a trainee for nine months—from February through October 1973—and, according to management, his work never reached the required level of accuracy. Forms returned to Jolly were accompanied by written critiques indicating errors, but appellant adopted a position that there was in fact no substantial problem with his work. He maintained that the errors identified by reviewers were either not his fault, insignificant, or the result of an inadequate training system. Jolly's supervisors, on the other hand, saw his poor perform-

---

1. Although he initially sought to postpone the transfer for "family reasons," he later admitted that his actual motive was to continue his struggle with the new leadership of Local 2206. Arbitrator's Hearing Transcript (Tr.) at 2015–16.

ance as resulting from "his lack of applying himself and trying to do the work," his failure to accept suggestions for improving his work, and a general "defiant" response to any criticism. On 24 July 1973 Jolly was given sixty-days' notice to improve his work. When the improvement had not occurred by 30 October, appellant was notified by letter that Mr. Yeorgan, the Acting Quality Appraisal Officer, was recommending that Jolly not be retained in the quality review position.

Jolly's duties with the SSA were also affected at least in part by his devotion to union activity. He was, according to management, frequently interrupted by non-work-related phone calls and visitors. While involved even in the "prestigious" staff development program, he refused to accede to a supervisor's request to cooperate in restricting work interruptions. When, after he returned to quality appraisal, Jolly's union-related activity continued to occupy an excessive share of his work day and began to interfere with retraining efforts, his new supervisors found it necessary to restrict the number of incoming phone calls during work hours and the amount of work time that could be used to represent other employees' grievances against management.[2]

On 27 December 1973 Jolly was sent a letter from E. J. Listerman, regional representative of SSA's Bureau of Retirement and Survivors Insurance, notifying appellant of a proposal to separate him from federal service and listing in detail the reasons for the proposed action. The charges in the notice were essentially these:

1. Poor quality of work;

2. Failure to cooperate with superiors—specifically:

(a) Failure to cooperate with supervisors' requests to limit grievance representation in order to permit concentration on retraining for the job;

(b) Failure to cooperate in limiting the number of nonwork-related telephone calls received during work hours;

(c) Resignation from the management training program, causing a waste of time and money spent planning Jolly's participation in the program and causing an inconvenience to the Atlanta Regional Office.

(d) Refusal to answer management questions concerning the publication of newsletters seen as particularly disparaging to management and of a type which could have a derogatory effect on employee morale;

3. Creating an atmosphere adversely affecting the employee-employer relationship by publishing activist newsletters and by holding himself out as president of Local 2206 after the trusteeship was imposed.[3]

Appellant denied the allegations in Listerman's letter and requested advisory arbitration, which was agreed to by both the agency and the AFGE. A month-long hearing before the advisory arbitrator yielded an opinion dated 12 December 1974 concurring with the SSA's proposal to discharge Jolly from federal service. This opinion was accepted by the agency on 20 December 1974, and the decision to separate Jolly from federal service was noticed as effective at the close of business on 27 December 1974.

---

2. Appellant filed an unfair union practice grievance challenging these restrictions, but it was ultimately rejected as without merit, with the following:

> With respect to the allegations that [management] restricted you in receiving "union" visitors at your work station and imposed restrictions in your receiving nonwork-related telephone calls at your work stations, there is insufficient evidence that [management's] decision to impose and implement these restrictions were [sic] motivated, in whole or in part, because of your activities assured by

[Executive] Order [11491]. Although [management] granted you certain privileges during the period of your incumbency as president of Local 2206, American Federation of Government Employees, [management's] obligation to continue to grant these privileges terminated when American Federation of Government Employees placed Local 2206 under Trusteeship.

(Tr. at 1930.)

3. See Notice of Proposal to Discharge Mr. Jolly, Joint Appendix (J.A.) at 5–14.

Appellant proceeded to the next stage of available administrative review by appealing the SSA's decision to the Civil Service Commission's Federal Employee Appeals Authority (FEAA).[4] At appellant's request a hearing open to the public was conducted by an FEAA representative on 10 and 11 September 1975. For reasons unimportant to the present review, the FEAA effectively struck charge number 3, relating to "creating an atmosphere adversely affecting employee-employer relationship," and parts (c) and (d) of charge 2 in the list of particulars, relating to resignation from the management training program and refusal to answer questions regarding the publication of the union's newsletter. Nevertheless, the FEAA upheld the dismissal on the remaining charges, concluding "that a removal action based on the sustained charges is not arbitrary, unreasonable or capricious and is for such cause as will promote the efficiency of the service."[5] Under Civil Service Regulation 772.309(b) the FEAA decision was final and there remained no further right of administrative appeal.[6] Jolly therefore proceeded to the courts.

On 25 May 1976 Jolly brought suit in the United States District Court for the District of Columbia seeking the usual declaratory, injunctive, and compensatory relief. Defendants moved for dismissal or summary judgment, and when Jolly failed to file a timely statement of points and authorities in opposition to defendants' motion, the district court dismissed the case. This court reversed the dismissal on appeal, however, and remanded the case to the district court for further consideration.[7] On remand the district court granted defendants' motion for summary judgment and ordered once again that the action be dismissed.[8]

Undeterred, Jolly followed the usual course by availing himself of a duplicative appeal to this court, arguing for a remand to the Social Security Administration with directions to reconsider the penalty imposed in light of the Civil Service Commission's having reduced the original charges against him. This court accepted appellant's request for a remand and made clear its reason for doing so:

> When a public employee is dismissed, and some of the grounds for termination are later held to be improper, . . . [and] if it is unclear whether the charges were deemed by the agency to constitute separate or cumulative grounds for discharge, the case should be remanded to the agency for reconsideration of the propriety of the punishment imposed.[9]

On 25 July 1980 Harry Overs, Director of the SSA's Office of Program Service Centers, transmitted to the district court, through the United States Attorney for the District of Columbia, a reply to the court's order that the SSA reconsider Jolly's separation. The reply indicated "a careful review of the record of the adverse action file, including the Agency briefs, the appellant's briefs, the transcript of the adverse action hearing before the Federal Employee Appeals Authority, the Arbitrator's recommendations and findings, the Assistant Appeals Officers' recommendations and findings, and Mr. Jolly's work record."[10] It stated further that "[f]ull consideration [had] been given to reinstating Mr. Jolly to his position in the Federal Service," but that a determination had been made that Jolly's removal action was appropriate and fully supported by the "charges and specifi-

---

**4.** This was the avenue of appeal available at the time, pursuant to 5 C.F.R. 752, 772 (1974). The channels of administrative appeal have since been modified to some degree by the Civil Service Reform Act of 1978, 5 U.S.C. §§ 1110–8913 (1978). *See* discussion in Note, 26 Wayne L.Rev. 97 (1979).

**5.** J.A. at 31.

**6.** *See* 5 C.F.R. § 772.307(c) (1974).

**7.** *Jolly v. Listerman,* 574 F.2d 637 (D.C. Cir.,1978), J.A. at 44.

**8.** *Jolly v. Listerman,* Civil No. 76–932 (D.D.C., 30 May 1978), J.A. at 48.

**9.** *Jolly v. Listerman,* 610 F.2d 999 (D.C.Cir. 1979), J.A. at 3.

**10.** Letter on Reconsideration, J.A. at 57–58.

cations sustained by the Federal Employee Appeals Authority." [11]

On 3 September 1980 the district court filed a memorandum order reaffirming its earlier action granting summary judgment to defendant and dismissing plaintiff's action. Subsequent motion by plaintiff to vacate the summary judgment and enter summary judgment for the plaintiff was denied and appellant once again seeks the review of this court.

## II. ANALYSIS

Appellant's arguments for reversal of the district court's summary judgment upholding the SSA's action may be grouped into two general positions: First, appellant contends that the agency's decision to uphold the prior discharge violated his rights to due process under (a) agency regulation and (b) the Fifth Amendment. Second, under a general approach that the SSA's action was arbitrary and capricious, appellant claims (a) that the charges leading to his discharge are not supported by evidence on the record, and (b) that even if the charges are substantiated, discharge was an excessive penalty under the circumstances. We address each of these arguments in turn.

### A. Due Process

The essence of appellant's due process arguments is that the trial court's grant of summary judgment for the agency relies upon allegations outside the original charges against Jolly and violates the agency's rules and regulations as well as Jolly's constitutional rights to due process. This argument finds root in appellant's contention that the SSA, in its review of Jolly's discharge at the behest of this court, actually "dredged up new allegations that were not contained in the agency's notice of proposal to discharge." [12] According to appellant, the charges that Jolly had been un-

cooperative with retraining efforts by receiving excessive numbers of visitors at his work station, that he had on one occasion been accompanied onto federal property after work hours by a person not employed by the SSA and in the possession of a handgun, and that he had given inconsistent reasons for leaving the Staff Development Program, were not charges included in the original list of particulars incident to his separation and were not supported in the administrative record leading to the district court's summary judgment. Appellant argues that these charges cannot validly play a part in the SSA's reconsideration of the propriety of his discharge and that to do so violated regulations binding on the SSA and interfered with Jolly's due process rights to be given advance notice of reasons relied upon for his removal. [13]

There is nothing essentially wrong with appellant's argument that an advance notice of reasons for discharging an employee and an opportunity for some kind of hearing on those reasons are vital elements of that employee's constitutional rights to due process. We are convinced, however, that due process requirements have in every respect been adequately met in this case.

### 1. Process due by "regulation"

▮▮▮ We recognize, as we have on prior occasions, that an agency is bound by its own procedural rules governing adverse action toward one of its employees, even where such rules require more than may be required under the due process clause of the Fifth Amendment. [14] We also recognize, however, that not "every piece of paper emanating from a Department or Independent Agency is a regulation." [15] We feel, upon examination of the "regulation" allegedly violated in this case and by reference to its own language, that it is actually

11. *Id.*

12. Appellant's Brief at 20.

13. *Id.* at 21.

14. *E.g., Doe v. Hampton*, 566 F.2d 265 (D.C.Cir. 1977); *Mazaleski v. Treusdell*, 562 F.2d 701 (D.C.Cir.1977). *See also Vitarelli v. Seaton*,

359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

15. *Piccone v. United States*, 407 F.2d 866, 877 (Ct.Cl.1969), (Nichols, J., concurring), quoted in *Doe v. Hampton*, 566 F.2d at 281.

intended to be something less than a binding rule. The passage, found in the Federal Personnel Manual, states simply that "if the notice of decision [in an adverse personnel action] in any way alters the reasons stated in the advance notice, except to reduce the seriousness of the reasons, the validity of the entire action *becomes questionable.*" [16] The impact of this provision is clearly informative, perhaps precatory, but certainly not directive or mandatory. The "becomes questionable" language alone signals no more than a warning to supervisors and management in government agencies that personnel actions must be taken with an eye to eventual and inevitable review under the standards of procedural due process.

In this sense, the passage simply calls attention to what the courts themselves have made clear on numerous occasions: an adverse personnel action may fail to pass muster under the Fifth Amendment when it appears to have been taken for reasons other than those of which affected individuals have been given notice and to which they have been allowed to respond.[17] This guideline has no meaning independent of the due process considerations inherent therein, and we find no merit in appellant's independent reliance upon the SSA's alleged failure to abide by this provision.

### 2. *Process due under the Constitution*

 It is an elementary principle of constitutional law that the right to due process attaches under the Fifth Amendment only where there is governmental action adversely affecting recognized liberty or property interests.[18] Interest in continued employment has been recognized as a protectible property interest in some cir-

cumstances, as where the employment is tenured or otherwise nonprobationary.[19] But, just as there is generally no protected interest in keeping a particular job beyond a probationary period, there is no recognized property right in a mere chance or expectation of being hired (or, we would add, *rehired*) by a particular employer or to a particular position. The only interests to which due process rights could have attached in this case were appellant's interests, while still employed in the federal service, in *continued* employment with the SSA. It is the discharge from this employment alone that is in the first instance arguably restricted by the due process requirements of advance notice and some kind of hearing. It is clear from the record and uncontested by appellant that these requirements were more than adequately satisfied; for purposes of the original discharge, by the advance notice given to Jolly and by the process afforded him in the lengthy evidentiary hearing before an independent advisory arbitrator, as well as the open hearing before the FEAA.

We find nothing in the SSA's reconsideration of the discharge which affects this clear compliance with constitutional due process. It is true that within the context of discussing Jolly's lack of cooperation with his superiors, the SSA's letter to Judge Pratt refers to the presence of excessive visitors at Jolly's work station. We are not persuaded, however, that this is a "new charge," as appellant would have us find; rather, it is an observation interrelated with appellant's continued activity in union representation, his apparent misuse of official time, and the frequent work interruptions

---

**16.** Federal Personnel Manual, Supp. 752–1, subchap. S7–2(a) (emphasis added).

**17.** *See Ralpho v. Bell*, 569 F.2d 607, 628 (D.C. Cir.1977) ("the opportunity to meet and rebut evidence utilized by an administrative agency has long been regarded as a primary requisite of due process").

**18.** *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**19.** A property interest in continued employment may be created by statute or by contract, *see Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), or in some circumstances perhaps even by "the existence of rules and understandings promulgated and fostered by ... officials." *Perry v. Sindermann*, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972).

specifically charged in the initial letter of particulars and addressed by evidence in testimony by both sides at the hearings.

As to the remaining "new charges" with which appellant takes issue, we find the Government's explanation and characterization helpful. The Government points out in its brief that the "charges" relating to the handgun incident and to the appellant's having given inconsistent reasons for leaving the Staff Development Program were in fact not relied upon in the portion of the SSA letter which addressed whether the charges against appellant, as reduced by the Civil Service Commission, were sufficient grounds for dismissal.[20] Reference to these incidents was limited to the SSA's *separate* consideration of whether, in spite of the determined validity of the grounds for appellant's discharge, discretionary *reinstatement* or *reassignment* would be appropriate. There is no constitutional error in this approach by the SSA, taken as it was in the context of a post-decision review.

We noted above that the formalities of procedural due process were clearly satisfied in the actions leading to Jolly's discharge. If we assume further, at least for purposes of present analysis, that the agency also did not step outside of statutory bounds,[21] we may treat Jolly as constitutionally unemployed, *i.e.*, as having been constitutionally deprived of any preexisting property interest in his SSA employment. Upon such a discharge, he is in precisely the same position (although for slightly different reasons) as any person who has no position in government service; and any subsequent decision by an employing agency, whether another agency considering whether to hire him, or the SSA pondering possible reinstatement, is *not* governed by the normal procedural standards of due process. There is thus no basis in a due process argument for prohibiting the SSA's reference to or reliance upon facts or factors neither included in the notice of discharge nor addressed on the record in determining whether the agency should exercise its purely discretionary power to reinstate Jolly into SSA service.

Appellant counters this position with an argument that such a bifurcated approach does not comply with the prior "directive" of this court. It describes the Government's explanation as "twisting this Court's remand into a two-step process of first determining whether 'the remaining charges warranted . . . dismissal' and then 'to make a separate determination of whether to reinstate appellant and reassign him.' "[22] Appellant argues that there is nothing in this court's memorandum opinion remanding the case to the SSA which supports this two-tiered consideration. Rather, it is proffered, the SSA was bound, in deciding whether Jolly should have been discharged, to a consideration of only (1) Jolly's performance record prior to the problems arising in the early 1970's; (2) the fact that the original charges were reduced; and (3) the court's observation that the remaining charges appeared to be "slight."

Appellant obviously misinterprets the thrust of the earlier memorandum opinion. This court simply intended, by remanding the case, to give the SSA an "opportunity to *reconsider* the exercise of its discretion."[23] It did not dictate an outcome or place specific procedural strictures upon the SSA any more than it afforded Jolly a chance *de novo* to challenge the factual conclusions drawn in prior adjudicatory proceedings. The SSA clearly satisfied the overall purpose of the remand and answered this court's concern by signaling that the original charges were not cumulative.[24] We find no violation of due process in the approach adopted by the SSA in making this determination.

---

**20.** Brief for Appellees at 15–16.

**21.** We leave for later in this opinion our discussion of the appellant's argument that the discharge was arbitrary and capricious and therefore outside of statutory authority.

**22.** Appellant's Reply Brief at 14.

**23.** *Jolly v. Listerman*, 610 F.2d 999 (D.C. Cir.,1979), J.A. at 3 (emphasis added).

**24.** *See* text accompanying note 7 *supra*.

## B. *The Arbitrary and Capricious Test*

Appellant's second area of argument is directed at alleged infirmities in the substantive aspect of this dismissal action. He contends that even if the SSA's action was procedurally sound, it must still fail because (1) the charges are not supported by the evidence on the record, and (2) even if the charges were established, the discharge itself was unjustified. For reasons discussed below, we find these arguments without merit.

### 1. *The charges and the record*

Appellant contends that the charges against him were not established by "substantial evidence" on the record and that the agency's action must for that reason be reversed. He supports this argument, however, with little more than a claim that the charges themselves were merely "pretextual," [25] and a restatement of his version of the facts. It is clear from the extensive factual arguments in his brief that *appellant's actual contention is not that the agency failed to present sufficient evidence to support his discharge, but that this court should find the agency's evidence unpersuasive against that offered by the appellant.* We of course may not follow this invitation to reweigh the evidence and at the same time adhere to our proper role in the review of personnel actions.

■ Our scope of review in a case of this type is exceedingly narrow,[26] restricted by relevant authority to a consideration *only* of whether the SSA's action is arbitrary and capricious, *i.e.* whether the conclusions upon which the agency acted are supported by record evidence and whether there is in other respects a rational basis for the discharge itself.[27] While this does require as a first step a review of the record, we are not here to retry the facts. There is no appeal on the merits as such in personnel actions of this type. Thus, where there is sufficient evidence upon which to base a rational finding, we do not have the right to retry the case on the theory that the factual conclusions were wrong. As this court has stated,

> [F]ederal judges do not sit as ombudsmen for government employment relations, nor do we indulge the conceit of substituting our own judgment *ad libitum* for that of the agency. Rather, we concern ourselves in the personnel business only insofar as is necessary to assure that the action challenged (1) is not arbitrary or capricious; (2) was reached in conformity with relevant procedural requirements; and (3) was not otherwise unconstitutional.[28]

■ We are therefore concerned, not with whether the factual issues in this case were resolved by the factfinders as we or as our dissenting colleague might have resolved them, but only with whether the factual conclusions are based on some evidence, *i.e.*, whether the agency engaged in

---

**25.** Appellant claims that he was actually discharged in retaliation for his resignation from the management program and for his anti-management union activities.

**26.** *Yacovone v. Bolger*, 645 F.2d 1028, 1032 (D.C.Cir.1981); *Doe v. Hampton*, 566 F.2d 265 (D.C.Cir.1977); *McTiernan v. Gronouski*, 337 F.2d 31, 34 (2d Cir. 1964).

**27.** We find no reason to muddy the waters of this review by adding some sort of "substantial evidence" gloss to the otherwise adequate "arbitrary and capricious" test. As Judge Tamm observed in some detail in *Doe v. Hampton*, 566 F.2d 265, 271 n.15 (D.C.Cir.1977), there is some question of whether the "substantial evidence" label, often used by other courts to describe their review of the evidence in personnel actions, adds anything to the actual scope of review by such courts. Furthermore, in light of

the traditional view that the substantial evidence test affords "a considerably more generous judicial review than the 'arbitrary and capricious' test," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 143, 87 S.Ct. 1507, 1512, 18 L.Ed.2d 681 (1967), we are concerned that application of a substantial evidence label to judicial review in such matters might lead to "a more generous judicial review ... than the reviewing courts are entitled to." 566 F.2d at 272 n.15. For these reasons, this court shall continue to review personnel actions of this sort under the "arbitrary and capricious" test of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1976).

**28.** *Doe v. Hampton*, 566 F.2d at 272 (footnotes omitted).

informed decisionmaking. There is adequate evidence in this case supporting the remaining charges against Jolly to satisfy us that the agency's action on the charges listed against Jolly was not irrational or otherwise arbitrary and capricious.[29] Our evidentiary review need go no further.

### 2. *The severity of the punishment*

Appellant's ultimate argument is that even if due process was afforded and even if there is evidence to support the charges, his discharge was excessive punishment and for that reason unwarranted by those charges as ultimately reduced. He relies in part on this court's earlier observation that the reduced charges seemed "slight in view of [Jolly's] many years of service."[30] He also claims that the SSA had not discharged other employees with unsatisfactory performance and that it was bound to follow a less severe disciplinary route, such as transfer, before resorting to discharge from the service. We address this latter argument first.

█ Appellant maintains that administrative policy binding on the SSA requires the attempted reassignment of employees with performance-related problems before reverting to the more harsh alternative of permanent discharge. The SSA's failure to conform to this requirement, according to

Jolly, deals a fatal blow to the reasonableness of the discharge in this instance. Appellant would find this "policy" in SSA personnel guidelines or in prior agency practice. We find it in neither.

The personnel guideline to which appellant refers states simply that "[a]n employee should not remain indefinitely in a position in which he is not performing at an acceptable level of competence. If he cannot be trained or motivated to perform the job acceptably, an attempt should be made to place him in a more suitable job."[31] Appellant puts particular weight on this guideline because this court referred to it in its prior memorandum opinion, hinting that it might properly be factored into the SSA's ultimate decision concerning the propriety of Jolly's discharge.[32] We do not feel, however, upon examination of this guideline and its context, that it constitutes a rule or regulation limiting the agency's options in this case.

First of all, the quoted phrase appears in a context of guidelines relating, not to discharges, or even to disciplinary actions in general, but to grants or denials of within-grade increases. There is no indication whatsoever in the guideline itself or in the surrounding text that its provisions have any relevance outside of this area. Certainly we have no basis for holding that this

**29.** Judge Edwards' dissent points to the testimony and data offered by Dr. William Campbell, a statistician employed by Mr. Jolly, as "the only objective comparative analysis of Mr. Jolly's performance with that of others," Dissent at 953, suggesting that the existence of such testimony supporting appellant's position that his job performance was satisfactory is sufficient to demonstrate that the agency's action was arbitrary and capricious. We disagree.

We find no clear error in the findings made by the independent arbitrator who first considered Dr. Campbell's testimony: "[O]n cross examination this testimony was shown to be based on incomplete facts and statistical information and did not in any way dispute testimony elicited on behalf of Management." Arbitrator's Findings at 6. The CSC found likewise: "after a careful review of the record, we conclude that the assumptions made by Dr. Campbell are invalid." J.A. at 24. The district court, in its initial review of this matter, found no reason to question this evidentiary conclusion:

"We further believe that the arbitrator and CSC were not arbitrary and capricious in discounting the testimony of Dr. William H. Campbell, offered by plaintiff to refute the charge that his work was of poor quality." *Jolly v. Listerman,* Civil No. 76–932 (D.D.C., 30 May 1978), reproduced in J.A. at 52.

The record in this matter includes the testimony of 42 witnesses before the arbitrator and 10 witnesses before the FEAA. In all, the transcripts in this case cover in excess of 3,600 pages. We find no reason to reverse the findings of the impartial factfinders against this record.

**30.** *Jolly v. Listerman,* 610 F.2d 999 (D.C. Cir.,1979), J.A. at 4.

**31.** *Personnel Guides for Supervisors,* Section VIII–C, reproduced in J.A. at 96.

**32.** *Jolly v. Listerman,* 610 F.2d 999 (D.C.Cir. 1979), J.A. at 4.

"rule" was intended to apply to adverse actions of the sort before us.

Secondly, even if the guideline were intended to find some application outside the context of within-grade increases, we would not be convinced that it would be a binding rule. The use of the word "should" in the phrase detracts significantly from any claim that this guideline is more than merely precatory. The fact that it is described as a "guideline" should also hint of precatory intent. We simply do not think that it may reasonably be interpreted as a binding procedural rule with which the SSA must comply in a personnel action of this nature.

No doubt anticipating such a conclusion, appellant argues further that an unwritten but nevertheless binding rule has arisen from a common SSA practice of seeking transfers as a prior alternative to seeking discharge for individuals in Jolly's position. As the Government points out, however, appellant is attempting by this argument to create a binding rule or regulation from a "common law" of only two instances occurring prior to his own discharge [33] where SSA employees were transferred rather than discharged. In one case, a quality appraiser whose errors had skewed national statistical results had responded to additional training and was allowed to remain on the job.[34] The second case to which appellant refers is that of an individual who was having unhappy experiences with his job and who was able to obtain a transfer to another department.[35] Not only is the factual similarity between the circumstances of these two cases and those underlying Jolly's discharge less than striking, but we do not believe that two instances alone provide a sufficient basis for finding an "established" practice giving rise to a binding rule of "transfer prior to discharge." There is no reason in this case to so limit agency discretion.

Even though subject to procedural strictures of the due process clause, statute, and sometimes regulation, the disciplinary power of an employer in the public sector, just as that of a business or individual in the private sector, remains largely discretionary. The Federal Personnel Manual, to which appellant himself cites, admits that "[t]here are many situations which may call for disciplinary action and [that] a wide variety of disciplinary actions are available.... *There is no substitute for judgment in selecting among them.*" [36] To accept appellant's argument for a type of "common law" rule binding the SSA in this case would be to deprive the SSA of the important role that judgment of the often unique circumstances of an individual case must play in the overall disciplinary scheme.

The personnel manual does call for "like penalties for like offenses." It warns, however, that "*surface* consistency should be avoided." [37] Emphasis is placed on appropriate agency consideration of all factors, particularly whether the action accords with justice in the particular situation. The determination of justice resides with the agency alone, subject of course to review for arbitrary and capricious action. We find in the totality of pertinent guidelines and policies behind effective administration and management no rule or regulation, whether explicit or arising as some sort of administrative estoppel from precedential practices, which dictates that the SSA must attempt to transfer an employee before it considers discharge.

◾ Our attention turns finally to appellant's contention that the discharge was simply not justified by the reduced charges and to his reliance for this position upon the footnote observation in the memorandum

---

**33.** The affidavits offered by appellant to the district court recite additional evidence of less severe disciplinary actions, J.A. at 78–81, but they postdate the original SSA action by as much as six years. They cannot be the basis of SSA precedent.

**34.** Tr. at 734–35.

**35.** *Id.* at 2550–51.

**36.** Federal Personnel Manual, chap. 751, "Discipline," subchap. 1–2(a) (emphasis added).

**37.** *Id.* at 1–2(c).

opinion accompanying remand of this case that "many of the specific charges seem slight." As this court has stated,

There may be ground for reasonable differences of opinion as to whether the cause for which the personnel action was taken was grave enough to warrant depriving appellant of his position, but the court is not warranted in substituting a different judgment of its own for that of appellant's superiors, whose action has been sustained by the Civil Service Commission and the district court.[38]

While this observation was made in a case that preceded the more recent trend by the courts to review personnel actions in general, its principle has been reaffirmed in other cases. In *Giles v. United States*[39] the Court of Claims held that an administrative determination of appropriate punishment in civil service disciplinary actions is judicially reviewable only if the punishment is *ultra vires* or totally unwarranted.[40] Stated in other terms, a court will not reverse on review where the penalty is not "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion."[41]

■ In the review of penalties in particular, the "abuse of discretion" or "arbitrary and capricious" tests focus on the relationship between the penalty, the offense, and the efficiency of the service.[42] Where this relationship is rationally based, we cannot say that there has been an abuse of agency discretion. Furthermore, where, as here, an employee has been afforded a full evidentiary hearing before an impartial factfinder and an open hearing before an impartial review board, the conclusions and recommendations of those bodies are due some weight, if not considerable deference.

■ In Jolly's case an independent arbitrator, after an extensive hearing involving examination and cross-examination by both sides, recommended that the agency discharge Jolly. The SSA discharged Jolly, the FEAA upheld the discharge on administrative appeal, and the district court upheld the discharge on the SSA's motion for summary judgment. There is no contention that the question of punishment was not fully reviewed at each level. Jolly argues that the recommendations and decisions were excessive.

It is within the entire context of procedure and deliberation that the observation by this court in its memorandum opinion that the charges seemed "slight" must be read. As we have emphasized before, the memorandum opinion was not intended to dictate to the SSA a final outcome in this case. It was simply this court's impression that under the circumstances of the FEAA's reduction of the charges the SSA should be given an opportunity to reconsider its position and to make clear whether the original charges were intended to be cumulative, or whether separate charges, standing alone, would have likewise resulted in Jolly's discharge. We are convinced that the SSA adequately reconsidered Jolly's situation upon remand, and we find no compelling reason in the record to question the SSA's ultimate judgment.

There is no draconian disproportion between the ultimate charges of unsatisfactory performance and lack of cooperation on the one hand and the penalty of dis-

---

**38.** *Studemeyer v. Macy*, 321 F.2d 386, 387 (D.C.Cir.), *cert. denied*, 375 U.S. 934, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963).

**39.** 553 F.2d 647 (Ct.Cl.1977).

**40.** *Id.* at 650.

**41.** *Power v. United States*, 531 F.2d 505, 507 (Ct.Cl.1976).

**42.** Tenured employees may by statute be dismissed where reasonably necessary to "promote the efficiency of the service." Lloyd-La-Follette Act § 6(a), 5 U.S.C. § 7501(a) (1970).

(Amendments made effective in 1979 are to the same effect. *See* 5 U.S.C. §§ 7511(a)(1); 7513(a).)

The courts have framed the "efficiency of the service" issue in terms of requiring a "nexus" between, as this court phrased it in *Doe v. Hampton*, "the articulated grounds for an adverse personnel action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate governmental interest promoting the 'efficiency of the service.'" 566 F.2d at 272.

charge on the other which would signal an abuse of discretion in the selection of the appropriate mode of discipline. There is no call for us to overturn the FEAA-approved and SSA-reaffirmed penalty determination in this case.

## C. *The Dissent's Reliance Upon the* Porter *Cases* [43]

We have considered the *Porter* cases relied upon by Judge Edwards in his dissent, and we disagree that our opinion today is inconsistent with these Fifth Circuit cases. Although the cases are in a sense factually related to the instant case,[44] separate legal issues are raised.

The *Porter* cases dealt with constitutional questions which are not before this court. Appellant there charged that "her Fifth Amendment right to due process was violated because she was suspended [for thirty days] without being allowed a full evidentiary hearing and that her First Amendment right of free speech was violated because she was punished for making protected speech."[45] The Fifth Circuit's holding on these combined issues was narrow. It held that it was inappropriate to rule against important constitutional claims by summary judgment when no evidentiary hearing had been held to settle genuine and material factual disputes, and on this basis it remanded to the district court for discovery and full trial.[46]

The Fifth Circuit did not predetermine that there was no basis for Porter's suspension, just as it did not rule on the First Amendment claims. As Senior Judge Skelton, sitting on the panel by designation, observed in a specially concurring opinion, "It may be that the agency was justified in suspending the appellant for 30 days. Whether or not this is so will now be determined in a meaningful hearing held in the district court. Consequently, it would be inappropriate for us to express an opinion on the merits of the case."[47]

We fail to see the similarities that Judge Edwards finds between the *Porter* cases and the matter before us. First, and contrary to *Porter*, there was a full evidentiary hearing in this case, and there is no continuing First Amendment issue before this court.[48] Second, there is still no record of any resolution of the factual issues in *Porter*. The Fifth Circuit made clear that one reason for the remand was to clear up the several issues which made factual conclusions impossible. Certainly, there was no resolution in *Porter* of the facts pertinent to Jolly's case. As the *Porter* court noted, "[T]he record in the instant case does not contain the record in the Jolly case, or even an adequate description of it by someone other than Porter."[49]

In our opinion, the dissent stretches the Fifth Circuit's position in either *Porter I* or

---

**43.** *Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979); *Porter v. Schweiker*, 648 F.2d 310 (5th Cir. 1981).

**44.** It was in her attempts to muster support for Jolly among fellow employees that Porter evidently ran into her own problems with management at the Birmingham center.

**45.** 592 F.2d at 771.

**46.** *Id.* at 777. The outcome in *Porter II* was equally narrow, again without any resolution on the merits. The court held simply that the government's settlement tender did not moot Porter's challenge, that dismissal was therefore inappropriate without further fact resolution, and that the question of whether Porter had abandoned claims against individual defendants should also be presented to the district court. 648 F.2d at 312. We fail to see the "conclusive and highly favorable decision" in

this case that Judge Edwards identifies in his dissent (Dissent at 957 n.13).

**47.** *Id.* at 786.

**48.** The charge upon which Jolly based a First Amendment argument when last before this court (refusal to discuss his newsletter publication) was found by the SSA on remand to be unnecessary to the agency's action: "[R]emoval is warranted without consideration of that specification." J.A. at 58. Whether for this or for other reasons, the First Amendment issue, as Judge Edwards notes, is not now before this court. There is therefore no reason to invoke the balancing test described in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and referred to in the Fifth Circuit's guidance to the district court in *Porter I*. 562 F.2d at 773.

**49.** *Id.* at 777.

*II* to suggest that it shows that Jolly was arbitrarily discharged and that our decision here, where a full and complete evidentiary hearing was provided, runs counter to those cases.

### III. CONCLUSION

Despite the concern of our dissenting colleague, which is strongly expressed and no doubt conscientiously held, this case does not involve a retaliatory dismissal of a whistle-blower—an action that no member of this court would countenance. We hold only that the findings and action of the responsible authorities were justified on the administrative record by Jolly's failure to achieve an acceptable level of performance in his assigned tasks. This opinion should be read to imply no more than what it clearly holds.

We have no reason to doubt that appellant Jolly was once a valuable employee of the SSA. It is apparent, however, that his increasing involvement with other interests, his union concerns and fights against new union leadership on the one hand and confrontations with management on the other, detracted significantly from the attention he was willing or able to devote to reacquainting himself with his job responsibilities. After returning full time to the SSA, he simply never got back to an acceptable work level on the job for which he was being paid day by day. It is always unfortunate when management finds it necessary to discharge an employee, but it is not our position to question the propriety of such an action when Jolly himself has been afforded more than ample opportunity to make his case and when impartial adjudication at various levels has supported the SSA's action.

This court's remand to the SSA had the limited purpose of seeking reassurance that the SSA's action would have been the same had it considered the charges as ultimately reduced. The SSA's reconsideration of the circumstances of the case and its reaffirmance of the initial discharge satisfies this concern. We have not been shown that the agency's decision was the result of an arbitrary and capricious approach to Jolly's situation, nor is there any indication that appellant has been afforded less than adequate due process. It is therefore not within our power or prerogative as a reviewing court to question the SSA's exercise of its discretionary powers as an employer, nor to reverse the SSA's decision. The district judge's opinion on this was the same: the facts supported Jolly's discharge. For this reason, and taking the record itself as undisputed, we find no cause to overturn the district court's grant of summary judgment. The district court's order is therefore

*Affirmed*

HARRY T. EDWARDS, Circuit Judge, dissenting:

The majority's decision in this case appears to prove the point that an individual employee who "blows the whistle" [1] on allegedly corrupt Government officials may eventually be swallowed by the system that he has challenged. The result here, as mandated by the majority decision, is surely a bitter defeat for an employee who deserved better at the hands of the law.

I am sorry that this court has been made an instrument of injustice by Government officials determined to destroy an individual who has served in the federal service for many years as a "valuable employee." Majority op. at 947. The majority has obviously turned a "deaf ear" to appellant's claim. This is unfortunate because it plainly has made it impossible for the majority to recognize that the Government's position in this case is a sham.

### I. BACKGROUND

This is a simple case of *unlawful retaliation* against appellant, Donald Jolly, who—

1. See *Porter v. Califano*, 592 F.2d 770, 774 (5th Cir. 1979) and *Porter v. Schweiker*, 648 F.2d 310 (5th Cir. 1981) (two decisions *against the Government* in a related case involving an employee who sought to defend Mr. Jolly and, as a consequence, was suspended by the same two supervisors who retaliated against Jolly in this case) [hereinafter referred to as *"Porter I"* and *"Porter II"*, respectively].

prior to his discharge—had worked for fourteen years with the Social Security Administration (SSA) at its Southeastern Program Center in Birmingham, Alabama. Mr. Jolly was fired only after he "blew the whistle" on certain SSA officials, by publishing a Newsletter accusing them of being involved in the purchase of AMWAY distributorships—a pyramid sales scheme involving the sale of women's clothing and cosmetics—and then extending preferential treatment to employees who agreed to sell the AMWAY products for them. Two of the officials who had been accused, a Mr. Listerman and a Mr. Bruce, were the principal management officials who acted to effectuate Mr. Jolly's termination.

From the start, it has been evident that management has attempted to hang Mr. Jolly with trumped-up charges. Indeed, as will be indicated below, the management disciplinary process has been a farce as the charges against Mr. Jolly have been modified at least four times during the course of the proceedings in this case. For this court to indulge—much less approve—the Government's actions in this case is a travesty and gross miscarriage of justice.

On two previous occasions, this court has ruled against the Government on appeals brought by Mr. Jolly.[2] The Fifth Circuit has also twice ruled against the Government in a separate but related case involving an employee who sought to defend Mr. Jolly and, as a consequence, was suspended by the same two supervisors who had acted to fire Jolly. *See Porter I* and *Porter II, supra* note 1. On this third appeal, after this court has already indicated in *Jolly II* (*see* APPENDIX A) that "the specific charges against Jolly seem slight," and noted "the questionable circumstance that [Jolly's] interrogation was conducted by one of the very supervisors the employee has publicly accused of wrongdoing," and expressed a strong view that "Jolly will be reinstated" ("in light of the reduced charges against him"), it is astonishing that the majority now rules that we must turn a "deaf ear" to the appellant's complaint.

The result reached by the majority is legally unjustified. Worse, the decision of the court today rubber stamps lawless Government actions that mock all notions of justice and fair play. I am convinced that many of Mr. Jolly's former colleagues at work, upon reading the majority opinion, will be convinced that it never pays to buck the system, especially if you are required to "blow the whistle" on an allegedly corrupt supervisor who is in a position to retaliate. It is unfortunate indeed that this message is being delivered by a court of law.

## II. THE CRITICAL FACTS MISSING FROM THE MAJORITY OPINION

Before proceeding to explain why I feel that the legal holding offered by the majority is plainly wrong, it is important first to highlight the critical facts in this case. The facts set forth in the majority opinion are, for the most part, entirely accurate. The problem, however, is that the majority fails to paint the full picture and thus effectively obscures Mr. Jolly's real complaint. In my view, once all of the facts are considered, there can be no doubt that the action taken against Mr. Jolly was arbitrary and capricious.

### 1. *Mr. Jolly's Employment Record at SSA*

Donald G. Jolly was a career civil servant who had been continuously employed by the Federal Government from 1955 until 1974. Mr. Jolly first gained employment with the Department of Health, Education, and Welfare, Social Security Administration in 1960, and worked continuously for SSA at the Southeastern Program Center, Birming-

---

**2.** *See Jolly v. Listerman*, 574 F.2d 637 (D.C.Cir. 1978), *reprinted in* Appendix ("A.") 45–46 (reversing the District Court's dismissal of appellant's claim and remanding for further consideration pursuant to a claim under Rule 60 of the Federal Rules of Civil Procedure); *Jolly v. Listerman*, 610 F.2d 999 (D.C.Cir.,1979), *re-*

*printed in* A. 1–4 (vacating a summary judgment of the District Court in favor of the Government, with instructions to remand the case to the Social Security Administration for further consideration) [hereinafter referred to as "*Jolly II*"]. The Memorandum Opinion in *Jolly II* is attached hereto as "APPENDIX A."

ham, Alabama, until he was fired in 1974. During his 14–year tenure with the SSA, Mr. Jolly received numerous promotions. At the time of his discharge, Mr. Jolly held the highest technical position within the agency, that of Quality Appraiser in the Quality Appraisal Branch. Further, during his tenure with the government, Mr. Jolly had received over 40 commendations and, prior to 1973, he had never received a work evaluation from a superior that was not outstanding. Indeed, in 1969, Mr. Jolly received a high quality increase in pay as a reward for outstanding work. A. 33–34.

It is important to understand the truly outstanding record compiled by Mr. Jolly during his many years of government service in order to comprehend the pretextual nature of the charges against him. Jolly was not an employee with a history of difficulty, either in his job performances or other personnel relations. His problems arose only when he chose not to continue participation in a management Staff Development Program, and when he "blew the whistle" on allegedly corrupt supervisors. As will be shown below, it was these two factors—not any deficiency in his work performance—that resulted in his discharge.

### 2. The Nebulous and Ever-Changing "Charges" Against Mr. Jolly

To read the majority opinion, one might get the impression that this case involves a straightforward charge of employee misconduct or poor performance. Quite the contrary. Instead, we have a situation involving an employee who has been subjected to unlawful retaliation and agency officials who have searched in vain for some

3. In the December 27, 1973 notice to separate, Mr. Listerman wrote to Mr. Jolly:

> On May 3, 1973, you were absent from your duty station . . . without authorization and without informing management of your whereabouts during the 4 hours from noon through the close of business. As a result . . . , management issued . . . a formal reprimand on June 8, 1973.

Mr. Jolly's alleged unapproved absence on May 3, 1973, was his "first and only unapproved absence in his fourteen-year" career at SSA. Appellant's Brief at 9 (citing from Arbitration

legitimate reasons to justify their lawless actions. This point is proven by the nebulous and ever-changing charges leveled against Mr. Jolly as this case has progressed through several appeals.

THE FIRST SET OF CHARGES: In September of 1973, shortly after Mr. Jolly had published a Newsletter accusing Mr. Listerman and Mr. Bruce of being involved in the AMWAY scheme, Jolly received a letter advising him that Mr. Listerman proposed to suspend him for "publishing . . . unsupported derogatory allegations, inflammatory remarks, and improper inferences in a publication entitled 'Newsletter,' dated August 1973." A. 83. On December 27, 1973, Listerman withdrew his proposal to suspend Jolly and substituted a proposal "to separate [Jolly] from the Federal service . . . no earlier than 30 days from the date [when Jolly received the] notice." A. 5.

Although Listerman never acted on his initial threat to suspend Jolly for publishing the Newsletter, it is important to note that the September 1973 notice of suspension was the first significant act of discipline proposed by management against Jolly.[3] It is also important to recall that the proposed suspension came only after Jolly had publicly accused Listerman and Bruce of misconduct in connection with the AMWAY scheme.[4]

THE SECOND SET OF CHARGES: In the separation notice of December 27, 1973, Mr. Listerman proposed to fire Mr. Jolly for the following reasons:

1. "Poor quality of work." A. 5.
2. "Failure to cooperate with your supervisors," A. 8, including:

Transcript at 1187; 1597–98). Whatever problem arose by virtue of the incident on May 3 was apparently cured by the formal reprimand; there is no evidence, nor does the Government even allege, that Jolly repeated the offense at any time after May 3.

4. "Similar criticisms of the AMWAY connection with the Office [had been made previously] to Listerman by Don Jolly in 1971, when he was president of the local of the American Federation of Government Employees." *Porter I, supra* note 1, 592 F.2d at 775.

a. Too much time expended representing agency employees in grievance matters.[5]

b. Failure to limit the number of telephone calls received.[6]

c. Resignation from the Staff Development Program. A. 9–10.

d. Refusal to answer questions from management concerning the publication of the Newsletter. A. 10.

3. "Creating an atmosphere adversely affecting employee-employer relationship." [7]

THE THIRD SET OF CHARGES: Following Mr. Jolly's hearing before the Civil Service Commission's Federal Employee Appeals Authority (FEAA), charge number 3 and parts c and d of charge number 2 from the December 27, 1973 notice of separation were deleted from the list of accusations leveled against Mr. Jolly. Nevertheless, in a decision rendered on November 10, 1975, the FEAA affirmed Mr. Jolly's discharge on the *reduced grounds* (*i.e.*, including only charges 1, 2a. and 2b.), concluding that the removal action was "not arbitrary, unreasonable or capricious and [was] for such cause as will promote the efficiency of the service." A. 16, 31.

THE FOURTH SET OF CHARGES: After this court vacated the judgment in favor of the Government in *Jolly II* (*see* APPENDIX A), and ordered that "the case should be remanded to the agency for reconsideration of the propriety of the punishment imposed," the Government once again changed its list of charges against Mr. Jolly. It is not surprising that the Government resorted to further *post hoc* rationalizations upon remand; agency officials obviously recognized that charges 2a. and 2b. from the December 27, 1973 notice of separation were patently without merit, *see* notes 3, 5 and 6, *supra*, and that charge 1 had been shown to be baseless, *see* Appellant's Brief at 11–16. Nevertheless, the important point here is that the Government's reliance on *new charges* after this case was remanded to the agency was wholly improper.[8]

Appellant, in his Reply Brief to this court, makes the following compelling argument regarding the agency's belated reliance on *new charges*:

On remand, SSA was to reconsider the "propriety of Jolly's dismissal in light of" (a) the reduced charges that "seem slight"; (b) Mr. Jolly's many years of service and (c) "SSA's own guidelines [which] provide for an attempt to place an employee in a more suitable position if his or her performance is unsatisfactory" (A. 4). It did not do this. It did not limit its reconsideration to the reduced charges. It gave no consideration to the 14 years of exceptional service Jolly had given to SSA. And it gave no consideration to whether Mr. Jolly could have been placed in a more suitable position before he was discharged. Instead, SSA "reconsidered" the propriety of Mr. Jolly's dismissal in light of new allegations that were not in the original notice of proposed discharge, were not in the record, or were rejected by the Civil Service Commission. This action by SSA was improper and constituted a denial of due

A. 9 (emphasis added).

---

**5.** The December 27, 1973 notice of separation states that Jolly was restricted from acting as a personal representative on any new grievances for six months commencing April 6, 1973. A. 9. There is nothing in the charge, however, to suggest that Jolly failed to comply with this restriction.

**6.** As to this charge, the December 27, 1973 notice of separation states that Jolly was "informed ... [on] April 6, 1973, that the secretary would take [his] telephone messages...." A. 9. However, the notice also adds that:

This restriction *brought about the needed improvement and on October 30, 1973, it was removed.*

**7.** This third charge related primarily to Mr. Jolly's publication of the Newsletter, and it appears to be a repeat of the September 28, 1973 notice of proposed suspension. A. 83.

**8.** It also should be noted that the agency's reconsideration on remand was achieved without a hearing, by a simple letter from Harry Overs, Director of the Office of Program Service Centers to the District Court indicating that (for some old and new reasons) the agency believed that Mr. Jolly's discharge was justified.

process. Furthermore, stripped of all of the improper considerations, SSA's decision to discharge Mr. Jolly on the reduced charges is arbitrary and capricious and without justification. Indeed, the reduced charges that SSA relies upon are pretextual. The real reasons for Mr. Jolly's discharge remain his resignation from the Staff Development Program and his publication of the August Newsletter. . . .

The three charges that were relied upon by SSA on remand but were not in the notice of proposal to discharge and were unrelated to the reduced charges that remain, are:

(1) That Mr. Jolly was uncooperative in that he had "excessive visitors at his work station", and when it was brought to his attention "took no steps to correct the problem" (A. 61);

(2) That "Mr. Jolly was accompanied by a person not employed by the Agency onto federal property after work hours while in the possession of a handgun" (A. 62); and

(3) That Mr. Jolly gave inconsistent reasons for leaving the Staff Development Program (A. 62).

SSA argues that the charge of "excessive visitors" was not new but rather was "interrelated" with other charges. SSA also argues that the latter two charges were not considered in its determination that the reduced charges justified Mr. Jolly's discharge, but only in its determination of whether reinstatement was warranted. Both arguments are unavailing.

Appellant's Reply Brief at 10–12. Appellant's contentions are neither surprising, nor are they the product of artful advocacy. Rather, the contentions flow from simple conclusions easily drawn from the plain record of evidence in this case.

In *Tygrett v. Barry*, 627 F.2d 1279 (D.C. Cir.1980), this court held that:

Absent the complicating factor of constitutionally protected conduct, a public employee can be discharged for a variety of reasons, and a probationary employee for even gossamer causes. That being so, any kind of reconstruction of the reasoning behind the discharge that provides the employer with a post hoc justification for its action cannot be allowed. To permit that kind of judicial "review" would eviscerate *Pickering's* effort to prevent the state from using its control over a person's job to penalize its employees for the exercise of their First Amendment rights. Therefore, it is essential, as Judge Leventhal said in an analogous case, that the court reviewing the discharge restrict its focus to "the reasons given by the [employer] and not on reasons that may come to light if and when a court rummages throughout the record in an effort to reconstruct on what basis the [employer] might have decided the matter." *United States ex rel. Checkman v. Laird*, 469 F.2d 773, 783 (2d Cir. 1972).

*Id.* at 1286. The principle enunciated in *Tygrett* is perfectly applicable here. Not only does this case involve a rather blatant attempt by the employer to "reconstruct" the bases of discharge, but it also involves what this court recognized in *Jolly II* as a "difficult [First Amendment] constitutional issue raised by Jolly on appeal." *See* APPENDIX A.

### 3. The Charge That Mr. Jolly's Quality of Work Was Poor Is Baseless

As suggested above, *see* notes 3, 5 and 6, *supra*, the only possible charge left to be raised against Mr. Jolly is the claim that the quality of his work was poor. The problem with this charge, however, is that there is absolutely no evidence to support it.

The agency offered no standard against which to measure Mr. Jolly's work performance. The majority opinion argues that Jolly was discharged because, "according to management, his work never reached *the required level of accuracy.*" Majority op. at 937 (emphasis added). But the record in this case reveals that management has acknowledged that there was no "required level of accuracy" for Quality Appraisers.

*See, e.g.*, A. 88.[9] That is precisely the problem. Indeed, *there is nothing in the record to even indicate whether Jolly's work performance was better or worse in 1973 than it had been in prior years when he was recognized to be an outstanding Quality Appraiser!*

Additionally, Dr. William Campbell, a statistician employed by Mr. Jolly, made the only objective comparative analysis of Mr. Jolly's performance with that of others. Based on Dr. Campbell's analysis, Jolly ranked among the top three Quality Appraisers in every category in terms of both productivity and accuracy. Dr. Campbell's assumptions were based upon the testimony of Brian Feldman, who was characterized by his supervisor, Mrs. Chlebowski, as an experienced and fully satisfactory employee in the Quality Appraisal Unit. Appellant's Brief at 14 (citing from Civil Service Transcript at 270). Even assuming Mr. Feldman's testimony only explains his own practices, Dr. Campbell's charts showed that Don Jolly's record was as good or better than Brian Feldman's and that Feldman and Jolly both did exactly the same "end of line" review work on samplings of claim files. A. 25. Mr. Feldman continues to work in the Quality Appraisal Unit.[10]

The plain truth of the matter is that certain officials at the SSA were out to get Mr. Jolly when he resigned from the Staff Development Program. The resolve of these officials was heightened when Mr. Jolly "blew the whistle" on them and publicly exposed the AMWAY scheme. The majority decision is seemingly blind to these realities—realities implicitly recognized in our decision in *Jolly II* (*see* APPENDIX A), and explicitly acknowledged in two separate decisions of the Fifth Circuit in *Porter I* and *Porter II, supra* note 1. It is too bad that the "deaf ear" of the majority has prevented them from hearing the truth.

III. THE AGENCY'S FAILURE TO REASSIGN MR. JOLLY WAS ITSELF ARBITRARY AND CAPRICIOUS, AND FURTHER EVIDENCE OF UNLAWFUL RETALIATION

Section VIII–C ("Mandatory Review of Negative Determinations") of the SSA *Personnel Guides For Supervisors*, states, in part, that:

> An employee should not remain indefinitely in a position in which he is not performing at an acceptable level of competence. If he cannot be trained or motivated to perform the job acceptably, *an attempt should be made to place him in a more suitable job.*

A. 96 (emphasis added). If it may be assumed, *arguendo*, that Mr. Jolly's work performance during 1973 was in fact unacceptable, then agency rules required that Mr. Jolly be placed "in a more suitable job."

Despite the Government's arguments to the contrary, the aforecited *Personnel Guide* is both clear and mandatory in its terms. Furthermore, the record is replete with uncontested evidence indicating that section VIII–C of the *Personnel Guide* routinely has been implemented by an SSA practice of reassigning, rather than dis-

---

**9.** In response to a Union inquiry about the evaluation of Quality Appraisers, a management official candidly

> explained that it would be impossible to measure accuracy on cases that were worked on, not only in the program centers, but also in the district offices. There is no definite method or formula, as the [Union] Council had requested, to determine individual accuracy on a sample basis.

A. 88 (report of Consultation Meeting between SSA and AFGE, May 7–9, 1974).

**10.** Milton Freedman, Assistant Bureau Director of Quality Appraisal of the Bureau of Retirement and Survivors Insurance, testified at the arbitration hearing about a Quality Appraiser (who he refused to name) whose work was so bad that it had fouled up SSA national data. Mr. Freedman admitted, however, that "that employee is still on the job." Appellant's Brief at 14 (citing from Arbitration Transcript at 735).

The reference to this evidence is not to suggest that the Government is obligated to retain inefficient employees on its payroll. Rather, the point to be made is that the action taken against Jolly, an employee with a history of good work performance, was unlawful retaliation when it is considered that other *less* qualified employees were retained when Jolly was fired.

charging, employees who are not performing at an acceptable level. A. 78–82. For example, the *unrefuted* affidavit of Donald W. Jones, President of one of the largest AFGE locals, states that:

> During these 12 years, I have participated in thousands of grievances involving employees of SSA, some of who [sic] have received notices of proposed disciplinary actions including proposed discharges. Also, I have been directly involved in dozens of cases in our program center in which management sought to discipline employees because of their unsatisfactory work performance. In each of these cases, management has followed its own procedure of placing the employee in a more suitable position either through lateral transfer or through a demotion, rather than discharging the employee. In fact, I do not know of a single instance in which an SSA employee who was unable to perform satisfactorily has been discharged without management first placing that employee in a more suitable position.

A. 78. There is absolutely nothing in the evidence in this case, or in the Government's brief to this court, that can be read to deny or dispute the well-established reassignment practice described by Mr. Jones and other witnesses giving statements on behalf of Mr. Jolly.

In *Doe v. Hampton*, 566 F.2d 265 (D.C. Cir.1977), this court held that:

> It is, of course, well-established that an agency must abide by its own regulations in effecting the removal of one of its employees. . . . If the *Manual* provision to which appellant now refers us is indeed a binding regulation and if the agency has failed to comply with its mandate to the prejudice of its employee, then an essential predicate to a valid removal will have been wanting.

*Id.* at 280 (citations omitted). In the instant case, it is undisputed that the SSA failed to follow its own internal regulations. No attempt was made to reassign Mr. Jolly, even though the *Personnel Guide* states, unequivocally, that such an attempt "should be made." Furthermore, in light of the clear language of the regulation, and the long-standing practices pursuant to the regulation, it can hardly be contended that the *Personnel Guide* provision on reassignments is merely precatory.[11] On this point, the court in *Doe v. Hampton* noted that:

> We of course recognize that the provision in question employs the directory "should be" rather than the mandatory "shall" or "must", but this should not be automatically determinative of the issue. . . . Particularly in this instance, this superficial indicium of intent should be weighed against . . . *any evidence that the Commission or the agency have by their past actions created a "common law" of reassignment* or of granting leave-without-pay.

*Id.* at 281–82 (emphasis added) (citation omitted). The undisputed evidence in this case plainly reflects a past practice which has "created a 'common law' of reassignment."

In addition, if there were any real questions on this issue, they were put to rest by our decision in *Jolly II* (*see* APPENDIX A). As a footnote to the observation that "it is possible that Jolly will be reinstated," the court in *Jolly II* stated that:

> We note that the SSA's own guidelines provide for an attempt to place an employee in a more suitable position if his or her performance is unsatisfactory, *see Doe v. Hampton*, 566 F.2d 265 (D.C.Cir. 1977).

*Id.* at n.1. Obviously, the only question left open in *Jolly II* was whether there was a suitable position available to accommodate Mr. Jolly, not whether the reassignment provision was mandatory.

---

11. In *Doe v. Hampton*, 566 F.2d at 280–81, the court first noted that "not 'every piece of paper emanating from a Department or Independent Agency is a regulation,'" and then distinguished between "mandatory" and "precatory" provisions. The court, however, left no doubt that a past practice of reassigning employees within an agency may give rise to an enforceable "common law." *Id.* at 281–82.

There is no doubt in this case that there was an available position into which Mr. Jolly could have been reassigned. In fact, Mr. Jolly sought a lateral transfer to the Operations Division of SSA and Hunter Keller, the Director of that Division, testified that he would have accepted Mr. Jolly if Mr. Listerman had acted upon the request.

All things considered, it must be concluded that SSA's failure to reassign Mr. Jolly, in lieu of discharge, was both unlawful and further evidence of the retaliatory tactics employed by agency officials against Jolly.

## IV. THE DECISION OF THE MAJORITY IN THIS CASE RUNS DIRECTLY COUNTER TO THE DECISIONS OF THE FIFTH CIRCUIT IN PORTER I AND PORTER II

One of the most distressing things about the majority decision in this case is that it is patently inconsistent with two related decisions recently handed down by the Fifth Circuit. *See Porter I* and *Porter II, supra* note 1.

The *Porter* case involves a suit brought by Ms. Ella Porter, who—like Mr. Jolly— was an employee at the Southeastern Program Center of the SSA in Birmingham, Alabama. Ms. Porter "was suspended [in June of 1975] primarily for writing and distributing a letter which, among other things, sharply criticized two of her superiors, appellees Listerman and Bruce." *Porter I*, 592 F.2d at 771. The specific charges against Ms. Porter read as follows:

1. Writing letters to employees communicating false information which injured the reputation of management officials, lowered employee confidence in the integrity of the organization and adversely affected the efficiency of the office.

2. Failure to cooperate with management.

*Id.* at 774. Porter defended herself against these charges mainly by asserting her First Amendment right to speak and by denying certain factual assertions implicit in the charges. *Id.*

What is particularly noteworthy about Porter's case is that she was suspended because she attempted to defend Mr. Jolly and because she, too, charged Listerman and Bruce with corrupt activities in connection with the AMWAY scheme. The decision in *Porter I* describes the factual context as follows:

The center of the case against Porter and of the first charge in particular is the material she distributed to her fellow employees in 1975. Porter distributed three things in the one mailing she made. First is a letter, dated February 20, 1975, and signed by Porter appealing for "financial and moral support" for Don Jolly, a former President of the American Federation of Government Employees local in the Program Center and a former coworker of Porter's. Jolly had been fired a few months before Porter distributed her letter and, according to Porter, needed funds for the legal expenses in his appeal of his termination. Before being fired Jolly had made certain charges of conflict of interest against Listerman and Bruce, and in her letter Porter alleged appellees had had Jolly fired because of these criticisms. In addition, the letter again asserted that Listerman and Bruce were corrupt. The basis of this assertion is Listerman's and Bruce's role in AMWAY. AMWAY is a private corporation which apparently sells women's clothes and make-up and which Bruce, Listerman and other Southeastern Program Center employees work or worked for part-time. Porter accused Bruce and Listerman of using government time for AMWAY work and, more significantly, influencing their subordinates in the Program Center to join the AMWAY operation by favoring AMWAY members when making government promotion decisions.

Similar criticisms of the AMWAY connection with the office were made to Listerman by Don Jolly in 1971, when he was president of the local of the American Federation of Government Employees. Jolly was fired in 1974, and was in the process of appealing his termination with the Civil Service Commission at the

time of Porter's suspension. In her letter Porter also alleged that Listerman had had Jolly fired because of his criticisms of AMWAY.

592 F.2d at 774–75 (footnotes omitted).

In examining Ms. Porter's complaint, the Fifth Circuit astutely compared the charges against Porter and Jolly, and commented:

[W]e note that charges two and three against Jolly are almost identical to the two charges against Porter. And we note that the two charges against Porter were initiated largely by Bruce and Listerman and were based on Porter's allegations about their role in AMWAY. Contrary to the thrust of Bruce's challenge to Porter, quoted above, it might seem that a careful reading of the official charges against Jolly, in light of the subsequent charges against Porter, would tend to confirm rather than discredit Porter's earlier suspicions about the reasons for Jolly's termination.

*Porter I*, 592 F.2d at 776 n.10. Throughout its opinion, the Fifth Circuit noted with disfavor the pervasive roles of Listerman and Bruce in connection with the retaliatory actions against Porter and Jolly.[12]

As to the Government's claim that Porter's charges against Listerman and Bruce were disruptive of agency operations, the court in *Porter I* stated:

An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.

592 F.2d at 773.

In its conclusion in *Porter I*, the Fifth Circuit ruled that, "[t]o the extent Porter's

suspension was based on [a charge of "failure to cooperate with management"], the suspension was arbitrary and capricious and is hereby set aside." 592 F.2d at 784. The case was then remanded to the District Court for further proceedings on Ms. Porter's complaint.

Following remand, the Administration and Porter entered settlement discussions. While discussions were underway, the Administration tendered Porter her back pay and expunged from her records any reference to the suspension. The Government then moved for summary judgment, or in the alternative, dismissal, contending that Porter had received everything to which she was entitled and that the case was thus moot. The District Court agreed and granted the motion. *Porter II*, 648 F.2d at 311.

Ms. Porter appealed the action of the District Court, and again prevailed at the Fifth Circuit. In its opinion in *Porter II*, the Fifth Circuit ruled as follows:

Porter contends, here, that the case should not have been dismissed. First, she argues that the government's tender of back pay and expungement of her records did not ensure her against retaliation by her superiors; therefore, the court needed to decide issues of fact before determining that an injunction was unnecessary. Second, Porter contends that after her successful appeal, the Social Security Administration improperly denied her one and possibly two job promotions and that an award of these lost promotional opportunities is part of the relief to which she was entitled.... Porter's point that the Social Security Administration's tender did not provide her with all the relief the district court might have ordered against the agency is

---

12. At one point the court noted that

[t]he chief inadequacy in the agency fact-finding procedures used in this case was the pervasive role played by Listerman and Bruce, the officials Porter explicitly accused of corruption. Bruce conducted the initial fact-finding interviews with Porter about her accusations.

*Porter I*, 592 F.2d at 782. At another point in the decision, the Fifth Circuit added that

we find the process inadequate in the instant case because the biased or otherwise inadequate initial fact-finding process was not cured by a subsequent impartial and full review in the agency.

*Id.* at 783.

well taken. And since we agree with Porter that the affidavits the Administration submitted did not preclude a contest of material facts related to these issues, we must remand to allow Porter the opportunity to prove her entitlement, if any, to further relief.

648 F.2d at 311–12 (footnote omitted).

The critical facts to be gleaned from the opinion in *Porter II* are: (1) the Government awarded Porter back pay and agreed to expunge her records; (2) the Government abandoned the defense implicit in *Porter I*, that "Porter spoke falsely, recklessly, or with malice" when she accused Listerman and Bruce of corruption, *see Porter I*, 592 F.2d at 777 n.10; and (3) the court explicitly recognized that Porter might need further protection against "retaliation."

Needless to say, it is virtually impossible to comprehend the decision of the majority in this case after reading the decisions in *Porter I, Porter II* and *Jolly II (see* APPENDIX A). The opinions of the Fifth Circuit cannot be ignored or distinguished on the grounds that *Porter* involved an employee other than Mr. Jolly.[13] *Porter*, as does this case, focuses on the corrupt and retaliatory acts of the same two agency officials, Mr. Listerman and Mr. Bruce, who acted against Mr. Jolly. Mr. Jolly's case prompted the suit by Ms. Porter, and the Fifth Circuit frequently refers to "*the connection between Porter's speech and Jolly's litigation of his own constitutional rights.*" *Porter I*, 592 F.2d at 780.

It is somewhat of an embarrassment that the lawless acts of the same Government officials have been so easily recognized and dealt with by the Fifth Circuit, and so totally ignored by the majority in this court.

## V. SSA's DISCHARGE OF MR. JOLLY WAS ARBITRARY AND MUST, THEREFORE, BE REVERSED

As has been demonstrated above, the evidence is clear that the first and only real reasons for the discharge of Mr. Jolly were his resignation from the Staff Development Program and his publication of the Newsletter exposing the AMWAY scheme. Numerous other reasons were offered at various times, as the Government sought to alter the charges against Mr. Jolly, but these *post hoc* rationalizations were plainly pretextual.

The evidence of retaliation and pretext is so clear that it will serve no useful purpose to repeat what has already been set forth in detail above. Under whatever test the majority seeks to employ—"arbitrary and capricious," "rational basis," "abuse of discretion," "substantial evidence," or "promoting the efficiency of the service," majority op. at 943 n.27—the Government cannot prevail in this case. Although the scope of review may be narrow,

> a reviewing court does not serve as a mere rubber stamp for agency decisions. Rather the function of judicial review is to ensure that agency decisions are "based on consideration of the relevant factors."

*Lead Industries Association v. Environmental Protection Agency*, 647 F.2d 1130, 1145 (D.C.Cir.1980) (quoting from *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). To follow any other approach "would render the appellate process a superfluous (although time-consuming) ritual." *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

It is clear that the various and everchanging reasons given to justify Mr. Jolly's discharge were merely pretextual, and that the true reasons for his discharge were (1) his resignation from the Staff Development Program and (2) his "blowing the whistle" on corrupt supervisors. It is equally clear that these true reasons cannot

---

**13.** In suggesting that "the Fifth Circuit's holding ... was narrow," majority op. at 947, the majority completely ignores the conclusive and highly favorable decision, for Ms. Porter and against the Government, in *Porter II*.

be used to justify the retaliatory action taken against Mr. Jolly, *see Porter I and Porter II, supra,* note 1; therefore, the judgment of the District Court should be reversed.

## VI. POSTSCRIPT

Unlike the majority, I cannot so easily dismiss the First Amendment considerations underlying this case. The evidence here shows that Jolly was retaliated against because he "blew the whistle" on corrupt supervisors by publishing the Newsletter. In this court's decision in *Jolly II, see* APPENDIX A, the panel recognized "the difficult constitutional issue raised by Jolly," but found it unnecessary to decide the question because of the strong suggestion "that Jolly [would] be reinstated" on other grounds.[14]

The opinion of the Fifth Circuit in *Porter I, supra* note 1, is even more clear on the point relating to the First Amendment issue:

An employee who accurately exposes rampant corruption in [his] office no doubt may disrupt and demoralize much of the office. *But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle because the speech somewhat disrupted the office.*

592 F.2d 773 (emphasis added).

The Government has, in this case, attempted to sweep the issue under the rug by dropping charges 2d. and 3 (pertaining to the Newsletter)[15] from the list of accusations leveled against Mr. Jolly. The modification of the charges, however, did not change the fact that the real reason for Mr. Jolly's discharge had to do with his publication of the Newsletter. In other words, the First Amendment issue that this court recognized in *Jolly II,* and the Fifth Circuit recognized in *Porter,* did not disappear merely because of a change in Government pleadings.

**14.** *See* discussion at the conclusion of section III, *supra.*

I find it unnecessary to pursue the First Amendment question, however, in part because the parties have framed the issues differently on this appeal, and in part because—as we said in *Jolly II*—there is no occasion here to decide the constitutional issue. As I believe the court assumed in *Jolly II,* the Government actions have been so outrageous and lawless on several counts, one need look no further than the "arbitrary and capricious" standard to justify Mr. Jolly's reinstatement in this case.

## APPENDIX A

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 78–1750

### DONALD G. JOLLY, APPELLANT

v.

### E. J. LISTERMAN, Regional Representative, Bureau of Retirement and Survivors, et al.

Appeal from the United States District Court of the District of Columbia.

Before McGOWAN, MacKINNON and WALD, Circuit Judges.

Filed December 6, 1979

. . . .

## MEMORANDUM

The plaintiff Jolly was discharged from his position with the Social Security Administration after fourteen years of service. His discharge was based upon alleged (1) poor work performance during several months immediately preceding his termination, (2) failure to cooperate with his supervisors based in part on his refusal to answer questions about a union publication which had printed articles critical of his supervisors, and (3) creating an adverse employee-employer atmosphere by publishing the newsletter.

**15.** *See* discussion in text between notes 7 and 8, *supra.*

The final charge, and some of the allegations in support of the second charge, were rejected as grounds for dismissal by the Civil Service Commission in the course of Jolly's appeal, but his dismissal was upheld by both the CSC and the district court. Jolly's principal argument on this appeal is that it is a violation of his First Amendment rights of free speech and association to rely as a ground for dismissal on his refusal to answer questions about his publication, particularly when one of his questioners was a supervisor he had criticized in his publication. He also contends that the case should be remanded to the Social Security Administration for reconsideration of the penalty in light of the reduced charges against him.

In this case, Jolly's original dismissal was expressly based upon "all" of the charges in his supervisor's letter, but the ultimate affirmance by the CSC of his dismissal, as stated above, was not on all the charges. When a public employee is dismissed, and some of the grounds for termination are later held to be improper, this court has held that if it is unclear whether the charges were deemed by the agency to constitute separate or cumulative grounds for discharge, the case should be remanded to the agency for reconsideration of the propriety of the punishment imposed. *Meehan v. Macy*, 392 F.2d 822, *aff'd on rehearing*, 425 F.2d 469, *aff'd en banc*, 425 F.2d 472 (D.C.Cir.1968). This is true whether the improper charges have been dismissed by this court, as in *Meehan*, or by the Civil Service Commission, as in *Slowick v. Hampton*, 470 F.2d 467 (D.C.Cir.1972), and is particularly important where the grounds for dismissal which are upheld are less flagrant than those which have been rejected. In either case, the plaintiff's employer agency should be given the opportunity to reconsider the exercise of its discretion to devise an ·appropriate penalty for its employee's misconduct, if any, in light of the changed circumstances. Therefore the cause must be remanded to the SSA in any event, and since it is possible that Jolly will be reinstated [1] or otherwise satisfied if the SSA is given an opportunity to reconsider, it is unnecessary for us to decide the difficult constitutional issue raised by Jolly on appeal. We conclude that the wisest course now is to remand to his employer agency for further consideration of the propriety of Jolly's dismissal, in light of the reduced charges, expressing no view on the constitutional issue raised here as to his questioning regarding his relationship to the publication.

---

1. We note that the SSA's own guidelines provide for an attempt to place an employee in a more suitable position if his or her performance is unsatisfactory, *see Doe v. Hampton*, 566 F.2d 265 (D.C.Cir.1977); that many of the specific charges against Jolly seem slight in view of his many years of service; and although we do not reach the issue of whether Jolly's questioning was *constitutionally* permissible, we note the questionable circumstance that his interrogation was conducted by one of the very supervisors the employee has publicly accused of wrongdoing. *See Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979). These factors further persuade us that reconsideration of the dismissal is warranted.